STATE v. JOSEPH GARDNER.[1]

November 24, 1905.

Nos. 14,532—(20)

**New Trial.**

Technical errors in rulings on evidence, which do not result in prejudice to the accused, and which can in no reasonable way affect the result of the trial, are not sufficient basis for granting a new trial in criminal prosecutions. State v. Nelson, 91 Minn. 143, followed and applied.

**Homicide—Self-Defense.**

In a trial for homicide in which there is an attempted justification by self-defense, it is reversible error to charge that such justification cannot be made out unless the accused in good faith endeavored to escape, although the jury was also instructed that he was not necessarily bound to retreat, where the proven circumstances preclude any practical means of escape or retreat without great increase in peril of death or of great bodily harm.

[1] Reported in 104 N. W. 971.

**Retreat to the Wall.**

The application of the doctrine of "retreat to the wall," originating, as it did, before the general introduction of firearms, has due reference to the difference in danger between a hand to hand encounter with fists, clubs, or even knives and an encounter in an open space, involving the use of repeating rifles by men experienced in handling them.

**Charge to Jury.**

In this case an instruction as to the duty to escape was not applicable to one of the state's theories of guilt, namely, that the defendant went to the residence of the deceased with the deliberate intention of killing him, and, finding him at work in his curtilage, immediately shot him, because no question of self-defense was involved.

**Same.**

Nor was such a charge applicable to its other theory, based on defendant's own statements to the sheriff and county attorney, whom he summoned to the scene of action, and to whom he narrated its details, and on his own similar testimony on the witness stand in his own behalf. According to that narrative, two resolute and neighboring frontiersmen quarreled over a crop of hay. Knowing of repeated threats by the other to kill him, the defendant went, at the request of, to the place of, the deceased, taking with him his rifle, in accordance with the custom of the wild and unsettled country, and also a compass and auditor's hay receipt, with which to settle the dispute. The deceased, at work in the open space about the house, was shot and killed while attempting to get his gun, near at hand, after the first words of address by the accused. An attempt to escape would have resulted in an unequal duel. If the defendant was justified in shooting, he was not required by the law to make a futile attempt at escape.

**Same.**

Under the circumstances of this case, the trial court properly charged that the defendant could not have been convicted of manslaughter.

Defendant was convicted in the district court for Itasca county, Spooner, J., of the crime of murder in the second degree and sentenced to confinement for life in the state's prison. From the judgment of conviction, and from an order denying a motion for a new trial, defendant appealed. Reversed and new trial ordered.

*C. ·C. McCarthy, W. M. Steele* and *Frank F. Price,* for appellant.

*Edward T. Young,* Attorney General, and *George H. Spear,* County Attorney, for respondent.

JAGGARD, J.

The defendant and appellant, Gardner, a homesteader in what is still a vast wilderness in the northern part of this state, was a typical pioneer, industrious, courageous, and self-reliant. He was a postmaster and mail carrier at the time of his arrest. The best citizens of the neighborhood in which he then lived and in which he had formerly lived testified to his good reputation. His character was that of a quiet, peaceable, law-abiding man. He had had trouble with William Garrison, living alone on a piece of land two and a half miles north of his place. Garrison, apparently a hardy man, of violent temper and quarrelsome disposition, and thoroughly familiar with the use of a rifle, on many occasions, and to a large number of different persons, had expressed his malice and hatred for the defendant, and his intention to kill him. Many of these threats were communicated to the defendant. At one time when this was done, the defendant said: "Well, we'll use him the best we know how; perhaps he will change." Garrison was thirty-five years of age, five feet eight or ten inches in height, weighting one hundred seventy-five to one hundred eighty pounds, and was very strong and active. Gardner was about forty-five years of age, five feet six and a half inches in height, weighing about one hundred thirty-eight to one hundred forty-two pounds. In the spring of 1904, defendant had purchased hay stumpage of lands east and adjoining Garrison's land. He informed Garrison of this purchase, who then said he would not allow Gardner to haul that hay. Both parties became angry, and had hot words. Garrison again told the defendant that he would never haul that hay.

On July 18, 1904, Gardner returned from Hibbing shortly before noon, and lay down on his bed. His son about noon wakened him, and told him that several days before Garrison, who had come to get some potatoes stored by consent in Gardner's roothouse, had directed him (the son) in Gardner's own words, to

> Tell your father when he comes home that he cut six tons of hay on my land last year, and to send him right down as soon as he comes home. I don't care whether Backus-Brooks pays for it or who pays for it, so I get my money.

Gardner also said he hadn't started to cut hay yet, but that he was going to start tomorrow. Thereupon defendant arose, put on his clothes, took his rifle, a compass, according to some, but not all, of the testimony, some mail belonging to Garrison, and the auditor's receipt for the payment of the hay stumpage. He testified that with no purpose of doing Garrison any harm, he intended to run the lines between the sections with Garrison, to show Garrison the receipt, and to prove that he had not cut any of Garrison's hay, and owned the hay stumpage for the year 1904. On his way, he saw that Garrison had cut some hay belonging to him. This made him angry, and he approached Garrison's place cursing, but he insists with the thought only that he would prosecute Garrison, and make him pay for the hay he had cut. He testified: "I can't say that I was extremely angry; I wasn't fighting angry; I was chewing-the-rag angry." Reaching Garrison's cabin, while going north, he found Garrison looking south, and standing astride a pole he was working on.

Garrison saw him, and, immediately facing him, moved over to the west side of the poles. At the same instant, defendant noticed Garrison's rifle leaning against the house or a stump. The distance between Gardner and Garrison was thirty-two feet; the distance between Garrison and the gun was thirty feet; the distance between Gardner and the gun was twenty feet. Gardner said to Garrison, with an oath: Who told you to cut that hay, Bill? Garrison leaped across the poles towards his gun, saying, as Gardner understood, "I'll show you." His face was distorted with passion, and he appeared to Gardner to be very angry. Gardner then called to Garrison, with the emphasis of an oath, "Hold on." Garrison jumped three feet towards his gun, and kept on going in that direction. At this time Gardner's gun was at rest in the hollow of his arm. He testified, in his own language, he knew that "Garrison was intending to get his gun to shoot me." To save his own life, thinking only of that, he fired at Garrison, and missed him. Garrison turned partially towards the defendant, commenced to maneuver by leaping back and forth and sideways, and was dodging in that way or going over a fence when defendant fired the second shot, which caused his death. A third shot was accidentally fired. Gardner finally found Garrison some distance away, and stood over him, and with a

96 M.—21

horrible imprecation said, "You have been working for this for a long time, and now you have got it."

He took Garrison's gun, went to his own house, sent one Otterman to Garrison's, and then walked and rode on a borrowed horse to Hibbing. There he caused a telegram to be sent to the sheriff of Itasca county at Grand Rapids, reading: "William Garrison shot in 64–23. Bring coroner and prosecuting attorney." Meanwhile Otterman having gone to Garrison's house, found that Garrison had crawled into bed, and was the solitary witness of his death. Just before his death, Garrison said: "If he [Gardner] hadn't of shot me, I would have shot him. I guess the cur has got my gun." When the sheriff and county attorney arrived, Gardner, who had been talking quite freely and not always consistently to a number of people, began to tell them about the tragedy. He was very properly and fairly cautioned by the county attorney as to the danger of that course, and that what he said might be used against him upon trial for murder. He persisted, explained the circumstances fully, accompanied the officers of the law to the scene of the tragedy, and there went over the details with them, indicating all the various places at which the different scenes occurred. Defendant was indicted for the crime of murder in the first degree. The verdict was guilty of murder in the second degree, and judgment was entered upon the verdict that the defendant be confined at hard labor in the state prison for the term of his natural life.

This case presents a state of facts peculiar to frontier life. All the direct evidence of what happened at the time of Garrison's death was supplied by the defendant himself. He had told many persons of the tragedy. His statements varied somewhat, but not materially. The circumstantial evidence was not conclusive as to either his guilt or innocence.

A most significant part of the evidence was the character of the wound itself. The autopsy showed two wounds in Garrison's body, one of entrance and one of exit. Both were on the front surface of the body. The wound of entrance was a large tear in the throat, almost immediately below the thyroid cartilage or Adam's apple. From that point the wound extended downward to the left, and made its exit below and to the right of the left axilla or armpit. The state contended that it could only have been inflicted while the deceased was stooping

over at his work, as he threw up his chin when he heard the accused approach, and insisted that all the circumstances indicated that the accused stole up on the dead man unarmed, and deliberately and maliciously shot him while in this position. On the other hand, counsel for the accused insist that the wound could have been produced while the dead man was working sideways away from the defendant, and was ducking and dodging up and down and sideways. The defendant assigns as one point of error that the trial court refused to allow him to demonstrate before the jury, by putting a man of the same size and weight as Garrison in the same position, that the wound could not have been produced in the way the state claims. It is ordinarily within the discretion of the trial court to determine to what extent he will permit such demonstrations to be made before the jury. We are not prepared to hold that the court in this case abused such discretion. It is, however, usual and proper to exercise greater liberality in permitting such demonstrations where homicide cases are on trial than in ordinary civil suits.

The assignments of error based upon alleged mistakes in the admission of evidence are not of such a nature as to entitle the defendant to a new trial. Of these, one is a clear case of erroneous admission of hearsay evidence upon a point not sufficiently material to have in any reasonable way affected the judgment of the jury. Another assignment is based upon an alleged error which arose in cross-examination, after evidence had been received on behalf of defendant to the effect that the witness had never heard anything against the reputation of the accused in the locality in which the witness lived, as to his being a quiet, peaceable, and law-abiding citizen. Upon cross-examination the court overruled an objection to this question directed to the witness: Have you

> Ever heard before that the defendant was engaged in any altercation, or had been engaged in any altercation, with any person or persons in which firearms were used?

The answer was:

> I heard of the incident. I did not hear that he shot at anybody. I heard that he had discovered some men stealing goods out of his sleigh, and he caught them, and delivered them to the authorities in Duluth.

The witness afterwards said that he placed that incident to Gardner's credit. If there was error in this question—which it is unnecessary, and, it seems, undesirable, to decide here—it is obvious that not only did it not prejudice the accused, but that the result was rather favorable to him. It is the settled rule of this court that upon such mere technical errors, which do not result in prejudice to the accused, and which can in no reasonable way affect the result of the trial, this court will not grant a new trial in criminal prosecutions. State v. Nelson, 91 Minn. 145, 97 N. W. 652; State v. Crawford, supra, page 95.

The assignments of error raise many questions as to the correctness of the charge of the court. The court charged, inter alia:

> But to justify the taking of human life in self-defense, it must appear from all the evidence that the defendant not only really and in good faith endeavored to avoid an encounter and to escape from his assailant before the fatal shot was fired * * * The right to defend himself by taking the life of his assailant would not arise until the defendant at least attempted to avoid the necessity of such an act; but in this connection I also charge you that it is the law that one who is assailed or threatened is not necessarily obliged to retreat, and whether or not under the circumstances of this case, the defendant was justified in doing as he did is a matter for you to determine, and not for the court to decide.

We are of opinion that this charge was erroneous in itself, (Perkins v. State, 78 Wis. 551, 47 N. W. 827; Shell v. State, 88 Ala. 14, 7 South. 40), and was not applicable to the facts proven. The common-law doctrine of "retreat to the wall" is thus referred to in a frequently quoted paragraph from Coke (3 Inst. 55): "Some be voluntary, and yet being done upon an inevitable cause, are no felony. As if A. be assaulted by B., and they fight together, and before any mortal blow given, A. giveth back, until he cometh unto a hedge, wall, or other strait, beyond which he cannot pass, and then, in his own defense and for safeguard of his own life, killeth the other; this is voluntary, and yet no felony." The rule on this subject has tended in some American jurisdictions to be enforced with strictness, in others to be largely modified, in accordance with changed conditions, and indeed to be

positively relaxed. See State v. Matthews, 148 Mo. 185, 49 S. W. 1085; Runyan v. State, 57 Ind. 80, 84.

In a leading case (Erwin v. State, 29 Oh. St. 186), after a review of the common-law authorities in consequence of this confusion in the later cases, the court, inter alia, said: "The question, then, is simply this: Does the law hold a man who is violently and feloniously assaulted responsible for having brought such necessity upon himself, on the sole ground that he failed to fly from his assailant when he might have safely done so? The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life where the assault is provoked; but a true man, who is without fault, is not obliged to fly from an assailant, who by violence or surprise maliciously seeks to take his life or do him enormous bodily harm."

The Supreme Court of the United States approved of this rule and of Runyan v. State, supra, in 1894, in Beard v. United States, 158 U. S. 550, 15 Sup. Ct. 962. In that case an angry dispute arose between Beard and three brothers, one of whom took a shotgun, and went with the others upon the premises of the accused for the purpose of taking away a cow in dispute. Beard returned to his home, taking with him a gun he was in the habit of carrying when absent from home, and finding the brothers on his premises ordered them to leave. This they refused to do. When the deceased got within a few steps of the accused, the latter warned him to stop, but he approached nearer, saying, "Damn you, I will show you," at the same time making a movement with his left hand as if to draw a pistol from his pocket. The accused struck him on the head with the butt end of his gun, and knocked him down, as a result of which he died. Justice Harlan said: (p. 564) "The defendant was where he had a right to be when the deceased advanced upon him in a threatening manner and with a deadly weapon; and if the accused did not provoke the assault, and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground, and meet any attack made upon him with a deadly weapon in such way and with such force as under all the circumstances he at the moment honestly believed, and had rea-

sonable grounds to believe, was necessary to save his own life, or to protect himself from great bodily injury."

In Rowe v. United States, 164 U. S. 546, 558, 17 Sup. Ct. 172, the defendant, a Cherokee Indian, had an altercation with the deceased at a hotel. After a quarrel at the supper table, the accused swore at the deceased and kicked him. The accused then leaned up against the counter, as if, according to his own testimony, he had abandoned the controversy. Immediately the deceased sprang at him, striking him with a knife, cutting him. Thereupon the accused shot and killed his assailant. The trial court charged in a carefully qualified way as to the duty of retreat. Justice Harlan, inter alia, said: "The accused was entitled, so far as his right to resist the attack was concerned, to remain where he was, and to do whatever was necessary, or what he had reasonable grounds to believe at the time was necessary, to save his life or to protect himself from great bodily harm; and, under the circumstances, it was error to make the case depend, in whole or in part, upon the inquiry whether the accused could, by stepping aside, have avoided the attack, or could have so carefully aimed his pistol as to paralyze the arm of his assailant, without more seriously wounding him."

This accords with the general law on the subject. Harbour v. State, 140 Ala. 103, 37 South. 330; People v. Newcomer, 118 Cal. 263, 50 Pac. 405; State v. Cushing, 14 Wash. 527, 45 Pac. 145; Babcock v. People, 13 Colo. 515, 22 Pac. 817; Brown v. Commonwealth, 86 Va. 466, 10 S. E. 745; State v. Cain, 20 W. Va. 679; State v. Evans, 33 W. Va. 417, 10 S. E. 792; Commonwealth v. Selfridge, 1 Horrigan & Thomp. Self-Def. 1; Pond v. People, 8 Mich. 150; People v. Macard, 73 Mich. 15, 40 N. W. 784; State v. Bartlett, 170 Mo. 658, 71 S. W. 148; Willis v. State, 43 Neb. 102, 61 N. W. 254; 25 Am. & Eng. Enc. (2d Ed.) 272, note 2.

The rule of law in this state is not inconsistent with this conception of the duty to retreat so far as is involved in the case at bar.

In State v. Shippey, 10 Minn. 178 (223), Wilson, C. J., said, inter alia: "It clearly appears that defendant deliberately and intentionally shot the deceased, and from this the presumption is that it was an act of murder. * * * Where the party has not retreated from or attempted to shun the combat, but has, as in this case, unnecessarily

entered into it, his act is not one of self-defense. The [defendant] by taking his gun and following after the deceased, without any previous provocation, such as the law will recognize as provocation for the use of a deadly weapon, showed conclusively that the homicide was not committed in self-defense, real or imaginary." In approving this case in State v. Sorenson, 32 Minn. 118, 19 N. W. 738, in which the deceased rushed at the defendant with a club, Gilfillan, C. J., said: "The law concedes the right to kill in self-defense, but only in extremity, and when no other practicable means to avoid the threatened harm are apparent to the person resorting to the right. If it was practicable, and is so apparent to him, to repel the attempt by other means than by killing his assailant, he is bound to do so. And all the authorities are agreed that ordinarily, as an element of legal self-defense in cases of personal conflict, the party killing must escape by retreat, unless prevented by some impediment or by the fierceness of the assault." The last-named case was approved in State v. Rheams, 34 Minn. 18, 24 N. W. 302, in which the deceased was unarmed and the defendant had a loaded revolver. In State v. Scott, 41 Minn. 365, 373, 43 N. W. 62, the evidence was such that no charge that the homicide was justified by self-defense, ignoring the circumstances of provocation by the defendant, would have been correct.

The doctrine of "retreat to the wall" had its origin before the general introduction of guns. Justice demands that its application have due regard to the present general use and to the type of firearms. It would be good sense for the law to require, in many cases, an attempt to escape from a hand to hand encounter with fists, clubs, and even knives, as a condition of justification for killing in self-defense; while it would be rank folly to so require when experienced men, armed with repeating rifles, face each other in an open space, removed from shelter, with intent to kill or to do great bodily harm. What might be a reasonable chance for escape in the one situation might in the other be certain death. Self-defense has not, by statute nor by judicial opinion, been distorted, by an unreasonable requirement of the duty to retreat, into self-destruction.

In the case at bar one of the theories of the state was that the defendant shot Garrison while he was at work leaning over the poles. In this view the charge as to escape was not involved, and the subject

should not have been referred to. It became relevant only in the consideration of the defendant's narrative of the tragedy. According to that narrative, the accused knew of the threats made by Garrison to kill him. Garrison was only thirty feet away from his rifle, leaning against the house or a log; defendant had more than one hundred paces to travel before he could reach the popples surrounding Garrison's curtilage. An attempted retreat finally must have resulted in exposing him to a duel with a dead shot like Garrison. It would not have been reasonable to have required him to have undertaken to reach and take Garrison's gun. Garrison, the larger man, would, as he said, have broken him in two before he could have secured it and protected himself. It was apparently as dangerous for him to retreat as to stand his ground. Duncan v. State, 49 Ark. 543, 547, 548, 6 S. W. 164. To use the expression of Chief Justice Gilfillan, referred to, if the jury believed the defendant's narrative, he had no "practicable means" to avoid threatened harm by an attempt to escape or retreat. "He had no reasonable way open to retreat without increasing his peril." Harbour v. State, supra. He had "come to a strait." Coke, supra. The fact that Gardner carried his gun did not justify giving the instruction. His contention was that this was in accordance with a natural and the general custom of the wild and unsettled wilderness in which he lived. Moreover, as was held in People v. Macard, supra, a person knowing his life to be threatened, and believing himself to be in danger of death or great bodily harm, is not obliged to remain at home in order to avoid an assault, but may arm himself sufficiently to repel anticipated attack, and pursue his legitimate avocation; and if without fault, he is compelled to take life to save himself, he may use any weapon he may have secured for that purpose and the homicide is excusable. And see Bohannon v. Commonwealth, 71 Ky. 481. It was accordingly reversible error, in any view of the case, for the trial court to have charged upon the subject of escape or retreat.

In connection with a new trial, it is desirable to refer to some other parts of the charge. With respect to the grounds of apprehension on the defendant's part, the trial court used on a number of occasions the expression "bound to know." It would have been better for the court to have employed the language of the statute (section 6461) namely:

Homicide is also justifiable when committed * * * in the lawful defense of the slayer * * * when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer, * * * and there is imminent danger of such design being accomplished.

See Germolus v. Sausser, 83 Minn. 141, 85 N. W. 946. In connection with the conduct of the accused in embarking in a quarrel, the case of Wallace v. United States, 162 U. S. 466, 16 Sup. Ct. 859, states the law clearly and simply.

The court properly excluded from the consideration of the jury the charge of manslaughter. It follows, from a consideration of the circumstances previously set forth and of the defendant's own testimony, that either he committed homicide, or that he killed the deceased in self-defense. The defendant himself testified clearly and positively that at the time of the shooting the only motive which actuated him was his own self-protection.

The judgment and order appealed from are reversed, and, in accordance with section 7391, G. S. 1894, a new trial is directed. The case is remanded to the district court to that end, and the warden of the Minnesota State Prison is hereby directed to deliver the said defendant to the sheriff of Itasca county, to be taken to Itasca county for such new trial.

Reversed, and new trial ordered.