STATE v. GEORGE R. COWING.[1]

July 27, 1906.

Nos. 14,825—(28).

**Rape—New Trial.**

A new trial is granted a defendant convicted of rape for three reasons:

1. The record does not sufficiently show the specific acts of resistance upon the part of the prosecutrix within the requirements of law.

In a prosecution for rape, resistance by the female is of necessity an issue only as it is involved in the proof of her want of consent, which is always required. To show such unwillingness her resistance must be proportionate to the occasion under the circumstances and at the time of the act complained of. In ordinary cases, there must be resistance to her utmost, or at least to the extent of her ability. In peculiar cases, a less degree may be sufficient. In exceptional cases, rape may be made out without any proof of resistance.

2. The testimony of the prosecutrix, somewhat inconsistent in itself, and in a number of respects impeached by her own former testimony upon preliminary examination, was corroborated in a measure, but largely by the testimony of her sister, who, together with her, destroyed the natural and best corroborating evidence.

3. The inference to be drawn from the unsatisfactory testimony of the two physicians who examined the prosecutrix was negatively in favor of the state in some respects. But that testimony, as a whole, justified inference adverse to the state because, inter alia, the physicians were not called until five and seven days respectively after the time of the alleged intercourse, and found no evidence of bruises or marks on her person traceable to the violence of the struggle. Order reversed and new trial granted.

Appeal by defendant from an order of the district court for Martin county, Quinn, J., denying a motion for a new trial, after a trial and conviction of the crime of rape. Reversed.

*Mathwig & Sasse, S. J. Abbott,* and *Lovely & Dunn,* for appellant.

*E. T. Young,* Attorney General, *J. E. Palmer,* County Attorney, and *E. C. Dean,* for the State.

[1]Reported in 108 N. W. 851.

JAGGARD, J.

This is an appeal from an order denying a new trial. The defendant was convicted of the crime of rape and sentenced to nine and a half years' confinement at hard labor at the State Prison.

He was a farmer, forty nine years of age, and had a family of seven children, including his oldest son, twenty two years of age. He was never before accused of any crime, and had lived continuously for many years on a farm adjoining the farm of the father of the complaining witness. The houses were about three-quarters of a mile apart. Apart from some trouble with rheumatism, the defendant was a man of at least ordinary strength and weighed about one hundred sixty five pounds. The complaining witness was unmarried, twenty three years of age, had done the usual work of a girl on the farm, was about five feet tall, and weighed about one hundred pounds. The testimony, read in the light of the trial court's memorandum, tended to show, but not satisfactorily, that she had not the average mental endowment, nor ordinary physical strength, and that she had suffered from continued ill health. The complainant's version is that when she was in the kitchen defendant came in softly "and grabbed me with my arms tight back of me and said, 'Lizzie, we are going to have some fun.' I said, 'No, I don't want no fun,' dragging me. After I said I didn't want any fun, he grabbed me with both arms again. When he grabbed me the first time I was standing by the stove with my back toward the door. When he grabbed me the second time I was standing the same way. Then he jerked me around, my face to the east and my arms back of me, and grabbed me tight, dragging me out of the kitchen in through the door into the front room south of the kitchen. While he was dragging me I tried to fight and get away as hard as I could, and screamed and hollered as loud as I could. I said for him to leave me alone, let go of me, but he dragged me in farther and throwed me on the couch with my arms under me and throwed me on my hands. I don't know how large the couch is. Then he kicked his left knee below my chest and pressed me down, and grabbed with his left hand into my throat and choked me as hard as he could, and with his right hand he rushed up my clothes so quick, and then he had sexual intercourse with me. It caused me to flow blood all over my skirt. I see him when he got off me. There was blood on his right hand, across his fingers, and across

the whole length of his hand. This intercourse caused me pain. My throat was sore, and I was lame all over. It caused me pain when he was doing this. My head ached. It hurt me at the time he was doing this hard, just as though some one was running a knife through me and tearing me all to pieces. I did not in any manner consent to that intercourse. I was not willing that he should have it with me. I tried just as hard as I could to get away. After he did this he went right off. When he got off my person he rushed his clothes right up quick with both hands and then went right out."

The defendant's version is that he drove to the house where the complaining witness lived, asked where her father was, and inquired if her father had left any money to pay for the threshing for which he owed the defendant. The witness came to the door, opened it, passed outside, and said she thought he was hard on them in more ways than one. When he asked her what she meant, she replied he knew well enough; that he and his wife had broken up the love match between her and the defendant's son Harry; and that if he and his wife had not interfered they would have been married some time ago. Defendant says he tried to reason with her, but that she grew angry and abused him, and threatened that she would get even if she had to injure herself. Defendant drove away while she continued gesticulating wildly and shouting in a violent manner. When he ascertained that a warrant had been issued for his arrest, he telephoned the sheriff that he would appear the next day. Accordingly he went to the county seat and surrendered himself to the sheriff, as he had agreed to. The testimony as to what happened at the time (Friday) is confined to the complaining witness and the defendant. The house was isolated, so that it might well have been that her outcries, if she made them, could not have been heard. There was no one else besides them in the house. Her father and sister returned in the afternoon, had dinner, remained a short time, left for some errands, and did not return until evening, and in the evening for the first time her sister learned what had happened.

Certain assignments of error on this appeal, directed to the rulings on evidence and the charge of the court, have been examined and found not sufficient to justify a reversal. They call for no particular reference beyond the expression of the opinion that a wide latitude should be allowed the defense, especially in the examination of the prosecutrix

as to her narrative and as to her physical and mental condition, including her conduct upon the witness stand, and that the correctness of the court's charge as to the extent of resistance is very doubtful. The record fairly presents the merits of the controversy. The appeal is not one to be decided upon mere technicalities, but upon other assignments of error which question the sufficiency of the evidence to justify the conviction. The trial was conducted with manifest care and effort at fairness; the convicted man was well defended; the memorandum of the trial judge evidences deliberate and impartial consideration, and the record shows doubts as to many material matters which he could resolve better than an appellate tribunal dealing only with a mere printed record; the propriety of granting a new trial is not entirely clear. The conclusion, however, has been reached that to so order will conduce to the administration of justice because of the following three reasons:

1. The principal question presented by the record concerns the sufficiency of the testimony of the prosecutrix to show the degree of resistance to the assault charged which the law requires. That degree, in the nature of things difficult of determination, has been the subject of much legal controversy.

It is of course true that, if a female of the age of consent voluntarily permits intercourse, rape is not made out. Mere verbal unwillingness does not amount to want of consent, and may amount to invitation. The utmost reluctance accompanied by the utmost resistance is undoubtedly sufficient. Between these two extremes the authorities are not in harmony as to what degree of resistance is necessary. On the one hand, a series of cases requires extreme opposition. In State v. Burgdorf, 53 Mo. 65, after holding that proof of the utmost reluctance and the utmost resistance on the part of the female was essential to make out a rape, the court said: "The 'passive policy,' or a mere halfway case, will not do." And see State v. Patrick, 107 Mo. 147, 17 S. W. 666. So in People v. Brown, 47 Cal. 447, 449, it was held that equivocal resistance not of a very decided character is insufficient. In Brown v. State, 127 Wis. 193, 106 N. W. 536, the rule is said to be "That in order to constitute a rape not only must there be entire absence of mental consent or assent, but there must be the most vehement exercise of every physical means or faculty within the woman's power to resist" and a persistence in such resistance until the offense is consum-

mated.    And see O'Boyle v. State, 100 Wis. 296, 75 N. W. 989.    Other cases requiring the utmost reluctance, which are numerically greatest, and the utmost resistance, will be found collected in note 8 on page 860, 23 Am. & Eng. Enc. (2d Ed.).

On the other hand there are authorities which refuse to recognize opposition to this degree.    Of these, the most conspicuous is State v. Shields, 45 Conn. 256.    At page 264, Park, C. J., said:    "While it may be expected in such cases from the nature of the crime that the utmost reluctance would be manifested, and the utmost resistance made which the circumstances of a particular case would allow, still, to hold as a matter of law that such manifestation and resistance are essential to the existence of the crime, so that the crime could not be committed if they were wanting, would be going farther than any well-considered case in criminal law has hitherto gone. . Such manifestation and resistance may have been prevented by terror caused by threats of instant death, or by the exhibition of brutal force which made resistance utterly useless; and other causes may have prevented such extreme opposition and resistance as the request makes essential.    The importance of resistance is simply to show two elements in the crime—carnal knowledge by force by one of the parties, and nonconsent thereto by the other.    These are essential elements, and the jury must be fully satisfied of their existence in every case by the resistance of the complainant, if she had the use of her faculties and physical powers at the time, and was not prevented by terror or the exhibition of brutal force.    So far resistance by the complainant is important and necessary; but to make the crime hinge on the uttermost exertion the woman was physically capable of making would be a reproach to the law as well as to common sense."

In Com. v. McDonald, 110 Mass. 405, it was held that the following instruction of the trial judge was correct, namely:    "The act of the defendant must have been without any consent on the woman's part; that the defendant must have used sufficient force to accomplish his purpose; and that the degree of resistance was frequently essential in determining whether the want of consent was real; but that there was no rule of law requiring the jury to be satisfied that the woman, according to their measure of her strength, used all the physical force in opposition of which she was capable."    It is pointed out in People v. Dohring, 59 N. Y. 374, at page 385, 17 Am. 349, that Reg. v. Camplin, 1 Cox,

C. C. 220, 1 Car. & K. 746, involved the use of liquor as the means of depriving the prosecutrix of a want of consent. And in Com. v. Roosnell, 143 Mass. 32, 40, 8 N. E. 747, Com. v. McDonald is treated as a case in which the consent was procured by fraud. In State v. Sudduth, 52 S. C. 488, 30 S. E. 408, it is held that it is sufficient if a woman shall show her unwillingness by word and act, and that it was not proper to require resistance to the utmost of her ability.

The conflict of these views of the law is often regarded as direct and irreconcilable. They are strikingly contrasted by Mr. Justice Brewer in State v. Ruth, 21 Kan. 583. He there concluded, in harmony with the general rule, that force may be actual or constructive and that yielding to either is not rape, and, following the Connecticut case just cited, that it is not essential for the female to make the utmost resistance; that if, in consequence of threats or display of force, she submit through fear of death or of great personal injury the offense is complete.

The inconsistency between the various formulæ of the rule will largely, but not entirely, disappear, as usually happens, when the rule laid down in individual instances is construed in connection with the particular facts under consideration in each case respectively. There may be cases in which to place undue emphasis upon its requirement improperly will convert the issue into the trial not of the man but of the woman. Resistance is necessarily relative. It is accordingly not necessarily illogical for courts to apply the general rule requirement of most vigorous resistance to common cases and to modify it in varying degrees and peculiar circumstances and to refuse to apply it to exceptional cases.

Clearly the leading case on the subject is People v. Dohring, supra. It is there said, inter alia: "Certainly, if a female, apprehending the purpose of a man to be that of having carnal knowledge of her person and remaining conscious, does not use all her own powers of resistance and defense and all her powers of calling others to her aid, and does yield before being overcome by greater force, or by fear, or being surrounded by hostile numbers, a jury may infer that, at some time in the course of the act, it was not against her will. Of course, the phrase 'the utmost resistance,' is a relative one; and the resistance may be more violent and prolonged by one woman than another, or in one set of attending physical circumstances than in another. In one case a

woman may be surprised at the onset, and her mouth stopped, so that she cannot cry out, or her arms pinioned, so that she cannot use them, or her body so pressed about and upon that she cannot struggle. But, whatever the circumstances may be, there must be the greatest effort of which she is capable therein to foil the pursuer and preserve the sanctity of her person. This is the extent of her ability."

Consistently with this rule it was afterwards held in People v. Connor, 126 N. Y. 278, 27 N. E. 252, which expressly approved People v. Dohring, that in view of the provisions of the Code which are similar to those in force in Minnesota, "any partial or voluntary submission to an assault will be construed now, as formerly, to amount to a consent; but, when submission is produced by the fear of great bodily harm, the necessity of showing the same degree of resistance required in other cases is unnecessary. * * * It is quite impossible to lay down any general rule which shall define the exact line of conduct which should be pursued by an assaulted female under all circumstances." Ruger, C. J., page 282 of 126 N. Y., page 253 of 27 N. E.

In Michigan, Chief Justice Cooley said, in Crosswell v. People, 13 Mich. 427, at page 433, 87 Am. Dec. 774: "The general rule requires not only that there should be force, but that the utmost reluctance and resistance on the part of the woman should appear." In People v. Crego, 70 Mich. 319, 38 N. W. 281, it was held that the following charge to the jury was correct: If you have reasonable doubt whether the prosecutrix made as much resistance as she could have done, you must acquit. But in Strang v. People, 24 Mich. 1, and in Don. Moran v. People, 25 Mich. 356, 12 Am. 283, the court requires the utmost resistance and reluctance, or that the will of the prosecutrix was broken by fear of defendant, and that the terror of his threats was so extreme as to preclude resistance. To the same effect see Turner v. People, 33 Mich. 363, 379.

In Indiana it was held in Mills v. State, 52 Ind. 187, that rape imports, not only force and violence on the part of the man, but also resistance on the part of the woman. In Anderson v. State, 104 Ind. 467, at page 474, 4 N. E. 63, at page 67, Niblick, C. J., said: "The nature and extent of resistance which ought reasonably to be expected in each particular case must necessarily depend very much upon the peculiar circumstances attending it, and it is hence quite impracticable to lay

down any rule upon that subject as applicable to all cases involving the necessity of showing a reasonable resistance." In Huber v. State, 126 Ind. 185, 25 N. E. 904, Elliott, J., said: "In order to make out the crime of rape, it is essential that the state should show beyond a reasonable doubt that there was an actual resistance and opposition on the part of the woman, or that opposition and resistance were overcome by violence or fear. Resistance or opposition by mere words is not enough. The resistance must be by acts and must be reasonably proportionate to the strength and opportunities of the woman." Anderson v. State approved of Com. v. McDonald, supra, and Huber v. State approved of People v. Dohring, supra; but it is quite clear that there is no necessary inconsistency between these cases.

In Iowa it was held, in State v. Ward, 73 Iowa, 532, 35 N. W. 617, that it must appear that the prosecutrix used all resistance in her power under the circumstances up to the time of intercourse. This is not inconsistent with the holding of the same court in State v. Cross, 12 Iowa, 66, 79 Am. Dec. 519, that a rape might be committed on a very young child, although she made no opposition.

So in Nebraska, while the ordinary rule requires resistance to the extent of the ability of the prosecutrix (Oleson v. State, 11 Neb. 276, 9 N. W. 38, 38 Am. 366; Mathews v. State, 19 Neb. 330, 27 N. W. 234, both approving People v. Dohring, supra), it was recognized, in Hammond v. State, 39 Neb. 252, 256, 58 N. W. 92, that there was an exception to the general rule in case of a rape on a very young child by its father.

From the authorities as a whole it fairly appears (1) that resistance by the female is an issue in a trial for rape only as it is involved in the necessary proof of her want of consent; (2) that to show such unwillingness her resistance must be proportionate to the occasion, under the circumstances and at the time of the act complained of; that is to say, in ordinary cases there must be resistance to the utmost, or at least to the extent of her ability, and in peculiar cases a less degree may be sufficient; (3) and that in exceptional cases rape may be made out without proof of resistance. The commentators on these and other relevant decisions so regard the law. 5 Cent. Law J. 102; 16 Cent. Law J. 320; 3 Crim. Law Mag. 504–506; 1 Current Law, 218. Mr. Clark's article on Rape in 23 Am. & Eng. Enc. (2d Ed.) 860–862, contains an excel-

lent collection of the cases, sets forth a series of formulæ used and approved by the various courts, and accords with this view of the law.

Perhaps the best general statement of the rule is that of Mr. Justice Peckham in Mills v. U. S., 164 U. S. 644, at page 649, 17 Sup. Ct. 210, at page 211, 41 L. Ed. 584, in which he cites People v. Dohring, supra: the rule of law is well settled that although a woman object verbally to the act of intercourse, yet if she by her conduct consents to it the act is not rape in the man. "If the woman at the time was conscious, had the possession of her natural, mental and physical powers, was not overcome by numbers or terrified by threats, or in such place and position that resistance would have been useless, it must also be made to appear that she did resist to the extent of her ability at the time and under the circumstances." The question has never been fully determined by this court. The relevant statutory provisions and decisions are not at variance with this rule of the federal supreme court. State v. Reid, 39 Minn. 277, 39 N. W. 796; State v. Iago, 66 Minn. 231, 68 N. W. 969; G. S. 1894, § 6523.

In the case at bar there is no lack of testimony to the conclusion that the prosecutrix did not consent, but there is little other evidence in this regard. She says she tried to fight and get away just as hard as she could while he was dragging her, but there is no specific act of resistance testified to after she was carried to the couch. She does not say that she employed the instinctive devices of self-defense; for example, she does not say that she crossed her legs or tried to keep them together. There is no evidence that she used the natural means of offense. While the defendant's left knee was below her chest and he was pressing her down and held her throat with his right hand, as she testifies, it might well be that she could not have taken her arms out from under her body; but it is unexplained why she did not free one arm at least when he was in the position he must afterwards have assumed to have accomplished his purpose. Not only is she not shown to have used or tried to use her hands, but there is no testimony that she used or tried to use her body, legs, or any other ordinary means of reprisal. Neither the victim nor the perpetrator appear to have borne any bruise or mark resulting from the struggle. There is confused testimony that one of her skirts was slightly torn; but no evidence that her clothing had been touched or torn. Nor does the record show any threats or intimidation

on the part of the defendant, or any intent on his part to use any means necessary to accomplish his purpose, nor any reasonable ground for apprehension of bodily harm, nor such a place or position of the prosecutrix as would have rendered resistance useless. It would seem that the only theory upon which her testimony is sufficient to show resistance is that ordinary means of self-defense were precluded by her mental condition. The record does not show her collapse or unconsciousness.

The only evidence on this point is in her cross-examination. She was asked whether she had not testified on the preliminary examination to a series of statements, including at the end the following: "'And pretty soon he threw up my clothes in a rush. My mind was gone so that I didn't know what he was doing. So pretty soon he got his privities into me as hard as he could and mauled it around as hard as he could.' Did you so testify?" She answered that she "did not testify that way the first time. Not the last part, I didn't." The reporter who took the minutes of the testimony on the examination before the magistrate swore that she did so testify. Moreover, her own testimony on trial, previously referred to, was not consistent with the denial.

For present purpose it is proper to consider this testimony most favorably to the prosecutrix; but, in allowing the testimony as to her mental condition to remain, it is to be borne in mind that there exist contradictions as to her statement of her own analytical consciousness at the time of the act. Her testimony reveals a clear memory and close observation as to what happened immediately before and immediately after the act complained of. She heard him tear her skirt, which, in the trial, she said did not tear very easily, and as to which, on the preliminary examination, she testified: "It tears very easy." The tear did not make a very loud noise, but she heard it tear. "I don't mean his little finger." She had previously testified that her hearing was reasonably good. After the act she said "there was blood on his right hand, across his fingers, and across the whole length of his hand." Immediately afterwards she testified that the accused left. She then saw cows break out and come up towards the house where there was a line of fancy clothes, and she didn't want them to chew them, so she went out as far as the porch and set the dog on them; but she didn't run, she "just wiggled out that far." This tes-

timony tends to corroborate that of the defendant as to the same incident. Taking the testimony as a whole it creates more than a grave doubt whether either resistance or a state of mind excusing the failure to resist was shown. It is apparent that upon a new trial the testimony of the prosecutrix could be made more definite as to the specific acts of resistance and as to the condition of her will at the time of the alleged outrage. The proof as to her mental and physical condition at that time, now inadequate and leaving much to conjecture, is susceptible of being properly made more certain. See State v. Peterson, 110 Iowa, 647, 82 N. W. 329.

It must occur that the circumstances of outrages such as this is alleged to have been are not so nearly identical that a decision on one state of facts can be regarded as determining another controversy. We are especially referred to Spaulding v. State, 61 Neb. 289, 85 N. W. 80, and Baer v. State, 59 Neb. 655, 81 N. W. 857, as containing judicial sanction of a conviction upon facts similar to those at bar. In the case first named, the court, commenting on the absence of resistance as would usually be expected, sets forth, among other things, that the prosecutrix struck the defendant, leaving a mark on him visible for some time thereafter, that he admitted receiving a blow from her; and that her testimony as to becoming unconscious was in a degree corroborated by other witnesses. In the last-named case the prosecutrix testified that in the struggle she was dragged around the floor many times, despite her most agonizing appeals to the defendant and to God. She was scratched, bruised, and her clothes torn, and made complaint immediately. There was also evidence of intimidation and of threats to kill.

To the case at bar more justly may be applied what Mr. Justice Dodge said in Brown v. State, 127 Wis. 193, 106 N. W. 536, 538: "Except for one demand, when first seized, to 'let me go,' and inarticulate screams, she mentions no verbal protests. While we would reasonably recognize the limitations resting on many people in attempting expression and description, we cannot conceive it possible that one whose mind and exertions had, during an encounter of this sort, been set on resistance, could or would in narrative mention nothing but escape or withdrawal. A woman's means of protection are not limited to that, but she is equipped to interpose most effective obstacles by means

of hands and limbs and pelvic muscles. Indeed, medical writers insist that these obstacles are practically insuperable in absence of more than usual relative disproportion of age and strength between man and woman, though no such impossibility is recognized as a rule of law. 3 Wharton & S. Med. Jur. §§ 172, 188, and authorities cited; 1 Beck, Med. Jur. p. 203. In addition to the interposition of such obstacles is the ability and tendency of reprisal, of counter physical attack. It is hardly within the range of reason that a man should come out of so desperate an encounter as the determined normal woman would make necessary, without signs thereof upon his face, hands, or clothing. Yet this prosecutrix, of at least fair intelligence, education, and ability of expression, in her narrative mentions no single act of resistance or reprisal. It is inconceivable that such efforts should have been forgotten if they were made, or should fail of prominence in her narrative." And see Livinghouse v. State (Neb.) 107 N. W. 854.

2. While not without some corroboration, the testimony of prosecutrix is aided most largely by that of her sister; but that corroboration is to be weighed in connection with the fact that she and her sister, by washing the skirt, which, if her testimony were true, would probably have borne evidence of blood and of semen, effectually destroyed the best possible evidence under the circumstances. She destroyed the union suit of underwear, which she wore at that time. She had bathed her person and destroyed evidence of semen on it, which the physicians for the state testified would have remained and could have been found after the expiration of several days, and under favorable circumstances a week, and in exceptional cases two, three, or four months. Her own testimony, as has in a degree previously appeared herein, is impeached in many respects, especially with reference to her outcries. At the preliminary examination before the magistrate, both she and her sister were examined. The testimony taken at that examination contradicts the testimony of both given at the trial in the district court in a number of matters. Her testimony on this trial was not entirely consistent with itself. Due allowance must, in all these cases, of course, be made for the confused and agitated state of a young woman of sensitive feelings in this most intensely embarrassing of situations; but, making this allowance, we find the testimony as a whole lacking in many respects that finality which is essential to justify a conviction of a charge so easi-

ly made and so hard to be refuted. See Mitchell, J., in State v. Connelly, 57 Minn. 482, on page 486, 59 N. W. 479, on page 481.

3. The act is charged to have occurred on Friday, September 29. The father was not informed until the following Tuesday. On October 4 the prosecutrix was examined by a physician, who found no injuries or bruises, except a slight discoloration and a scratch on the neck. Two days later another physician examined her, and found no marks or injuries upon her, except this scratch on her neck. No particular significance is, on the state of the record and the assignment on appeal, to be attached to that scratch or discoloration, nor to the usual testimony of the physicians as to the breaking of the hymen, which did not undertake to determine either the time or the cause of its rupture. The expert testimony, taken as a whole, contains some, but not strong, corroboration of the version of the prosecutrix. Its effect in this direction is diminished by the length of time which elapsed after the act and before the physicians were called. "Under ordinary circumstances it is the duty of the woman injured in this way, or of her friends, to obtain prompt medical advice; and the omission to do so, in cases of alleged rape, is a fact which subjects the prosecutrix to discredit." 1 Whart. on Crim. Law (10th Ed.) § 565. That there was no indication of violence is a strong circumstance of defense. People v. Benson, 6 Cal. 221, 65 Am. Dec. 506; People v. Hamilton, 46 Cal. 540. In State v. Burgdorf, 53 Mo. 67, it is said: "It certainly must have been a very amicable struggle which would inflict no bruises on the girl."

The testimony as to how soon after the act of violence had been committed marks on the person would have disappeared is not entirely wanting and aids the state; but it is limited and unsatisfactory. The record, taken as a whole, leaves the impression that the inability of the physician to find bruises or other evidences of violence on the person of the prosecutrix also justifies an inference adverse to proper resistance on her part. One physician, having testified on both direct and cross-examination as to the absence of bruises, and that he had heard her testimony, the record proceeds:

Q. Assuming the testimony to be true, are you able to state as a medical man whether or not marks would have been visible upon the person of the complaining witness at the time you made

the examination? (Objected to by the state on the ground that it is not proper cross-examination. Sustained.)

This was proper enough cross-examination, but the question does include the assumption in the answer of the physician of too large a range of facts wholly beyond the limit of expert testimony, and beyond any testimony given by the prosecutrix as to the actual facts of resistance. It was therefore improper. See State v. Teipner, 36 Minn. 535, at page 537, 32 N. W. 678, at page 679. Within the settled practice of this state any technical error which may have been thus involved would not have justified the granting of a new trial. State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Gardner, 96 Minn. 318, 104 N. W. 971. The defense, however, had a right to show by expert evidence the length of time for which bruises, made during the struggle which the law contemplates would have been made, are recognizable. In the absence of statement on the part of the prosecutrix as to the specific acts of resistance from which bruises and the like might follow, defendant was precluded from exercising that right.

The judgment and order appealed from are reversed, and in accordance with section 7391, G. S. 1894, a new trial is directed. The case is remanded to the district court to that end, and the warden of the Minnesota State Prison is hereby directed to deliver the said defendant to the sheriff of Martin county, to be taken to Martin county for such new trial.

LEWIS, J. (dissenting).

When the whole record is read consecutively, several side lights are thrown upon the case which do not appear from the above statement of facts. Considering the physical condition of the prosecutrix, her graphic account of what occurred and how she was handled, defendant's subsequent conduct prior to arrest, the complete breaking down of all lines of defense, and his impeachment for truth and veracity, I am decidedly of the opinion that the trial court and jury were entitled to pass upon the question whether the offense was proven, although the prosecutrix did not testify that she tried to prevent it by crossing her legs.

START, C. J. (dissenting).

I concur in the dissent of Mr. Justice LEWIS. A careful considera-tion of the whole evidence leads me to the conclusion that it sustains the verdict of guilty.