**Victoria Price STREET,**
**Plaintiff-Appellant,**

**v.**

**NATIONAL BROADCASTING CO.,**
**Defendant-Appellee.**

No. 77–1682.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1979.

Decided March 13, 1981.

John W. Peck, Senior Circuit Judge, filed separate dissenting opinion.

Don Wyatt and Raymond W. Fraley, Jr., Fayetteville, Tenn., for plaintiff-appellant.

Robert R. Campbell, John W. Wheeler, Hodges, Daughty & Carson, Knoxville, Tenn., Arthur E. Simms, Jr., Fayetteville, Tenn., for defendant-appellee.

Before MERRITT and BOYCE F. MARTIN, Jr., Circuit Judges, and PECK, Senior Circuit Judge.

MERRITT, Circuit Judge.

This is a Tennessee diversity case against the National Broadcasting Company for libel and invasion of privacy. The plaintiff-appellant, Victoria Price Street, was the prosecutrix and main witness in the famous rape trials of the Scottsboro boys, which occurred in Alabama more than forty years ago. NBC televised a play or historical drama entitled "Judge Horton and the Scottsboro Boys," dramatizing the role of the local presiding judge in one of those trials.

The movie portrays Judge Horton as a courageous and tragic figure struggling to bring justice in a tense community gripped by racial prejudice and intent on vengeance against nine blacks accused of raping two white women. In the movie Judge Horton sets aside a jury verdict of guilty because he believes that the evidence shows that the prosecutrix—plaintiff in this action—falsely accused the Scottsboro defendants. The play portrays the plaintiff in the derogatory light that Judge Horton apparently viewed her: as a woman attempting to send nine innocent blacks to the electric chair for a rape they did not commit.

This case presents the question of what tort and First Amendment principles apply to an historical drama that allegedly defames a living person who participated in the historical events portrayed. The plaintiff's case is based on principles of libel law and "false light" invasion of privacy [1] arising from the derogatory portrayal. NBC raises alternative claims and defenses: (1) the claim that the published material is not defamatory; (2) the claim of truth; (3) the common law privilege of fair comment; (4) the common law privilege of fair report on a judicial proceeding; (5) the First Amendment claim that because the plaintiff is a public figure recovery must be based on a showing of malice; and (6) even if the malice standard is inapplicable, the claim that recovery must be based on a showing of negligence.

At the end of all the proof, District Judge Neese directed a verdict for defendant on the ground that even though plaintiff was not a public figure at the time of publication the defamatory matter was not negligently published. We affirm for the reason that the historical events and persons portrayed are "public" as distinguished from "private." A malice standard applies to public figures under the First Amendment, and there is no evidence that the play was published with malice.

## I. STATEMENT OF FACTS

### A. Historical Context

In April 1931, nine black youths were accused of raping two young white women while riding a freight train between Chattanooga, Tennessee, and Huntsville, Alabama. The case was widely discussed in the local, national, and foreign press. The youths were quickly tried in Scottsboro, Alabama, and all were found guilty and sen-

---

1. False light invasion of privacy is one of four generally recognized forms of the tort of invasion of privacy. It differs from the other three forms in that falsity is one of its essential elements. *See generally* Prosser, Torts § 97 (2d Ed. 1955).

tenced to death. The Alabama Supreme Court affirmed the convictions. *Weems v. State*, 141 So. 215, 224 Ala. 524 (1932); *Patterson v. State*, 141 So. 195, 224 Ala. 531 (1932); *Powell v. State*, 141 So. 201, 224 Ala. 540 (1932). The United States Supreme Court reversed all convictions on the ground that the defendants were denied the right to counsel guaranteed by the Sixth Amendment. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The defendants were retried separately after a change of venue from Scottsboro to Decatur, Alabama. Patterson was the first defendant retried, and this trial was the subject of the NBC production. In a jury trial before Judge Horton, he was tried, convicted, and sentenced to death. Judge Horton set the verdict aside on the ground that the evidence was insufficient. Patterson and one other defendant, Norris, were then tried before another judge on essentially the same evidence, convicted, and sentenced to death. The judge let the verdicts stand, and the convictions were affirmed by the Alabama Supreme Court. *Patterson v. State*, 156 So. 567, 229 Ala. 270 (1934), and *Norris v. State*, 156 So. 556, 229 Ala. 226 (1934). The United States Supreme Court again reversed, this time because blacks were systematically excluded from grand and petit juries. *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), and *Patterson v. Alabama*, 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082 (1935). At his fourth retrial, Patterson was convicted and sentenced to seventy-five years in prison. *Patterson v. State*, 175 So. 371, 234 Ala. 342, *cert. denied*, 302 U.S. 733, 58 S.Ct. 121, 82 L.Ed. 567 (1937). Defendants Weems and Andrew Wright were also convicted on retrial and sentenced to a term of years. Defendant Norris was convicted and his death sentence was commuted to life imprisonment by the Alabama governor. Defendants Montgomery, Roberson, Williams, and Leroy Wright were released without retrial. Powell pled guilty to assault allegedly committed during an attempted escape. The last Scottsboro defendant was paroled in 1950.

The Scottsboro case aroused strong passions and conflicting opinions in the 1930s throughout the nation. Several all white juries convicted the Scottsboro defendants of rape. Two trial judges and the Alabama Supreme Court, at times by divided vote, let these verdicts stand. Judge Horton was the sole trial judge to find the facts in favor of the defendants. Liberal opinion supported Judge Horton's conclusions that the Scottsboro defendants had been falsely accused.

During the lengthy course of the Scottsboro trials, newspapers frequently wrote about Victoria Price. She gave some interviews to the press. Thereafter, she disappeared from public view. The Scottsboro trials and her role in them continued to be the subject of public discussion, but there is no evidence that Mrs. Street sought publicity. NBC incorrectly stated in the movie that she was no longer living. After the first showing of "Judge Horton and the Scottsboro Boys," plaintiff notified NBC that she was living, and shortly thereafter she filed suit. Soon after plaintiff filed suit, NBC rebroadcast the dramatization omitting the statement that plaintiff was no longer living.

### B. The Dramatization

The script for "Judge Horton and the Scottsboro Boys" was based on one chapter of a book by Dr. Daniel Carter, an historian, entitled *Scottsboro: A Tragedy of the American South* (Louisiana State University Press, 1969). The movie is based almost entirely on the information in Dr. Carter's book, which, in turn, was based on Judge Horton's findings at the 1933 trial, the transcript of the trial, contemporaneous newspaper reports of the trial, and interviews with Judge Horton and others. NBC purchased the movie from an independent producer.

Plaintiff's major libel and invasion of privacy claims are based on nine scenes in the movie in which she is portrayed in a derogatory light. The essential facts concerning these claims are as follows:

1. After an opening prologue, black and white youths are shown fighting on a train.

The train is halted, and the blacks are arrested. The next scene shows plaintiff standing next to Ruby Bates at the tracks. Plaintiff claims that this scene, in effect, makes her a perjurer because she testified at the 1933 trial and in this case that she fainted while alighting from the train and did not regain consciousness until she was taken to a local grocery store. Judge Horton, in his opinion sustaining the motion for a new trial, found that the observations of other witnesses and the testimony of the examining doctor contradicted her testimony in this respect. Horton concluded that it was unlikely that Victoria Price had fainted.[2]

2. As plaintiff and Ruby Bates are led away from the tracks by the sheriff and his men, the sheriff in the play calls the two women a "couple of bums." There is no indication in Judge Horton's opinion, in the 1933 trial transcript, or in Dr. Carter's book that this comment was actually made.

3. In a pretrial conversation between two lawyers representing the defendant, the play portrays one of them as advising restraint in the cross-examination of plaintiff Price. He says to the other defense lawyer: "The Scottsboro transcripts are really clear . . . . The defense at the last trial made one thing very clear, Victoria was a *whore*, and they got it in the neck for it . . . ." (Emphasis added.) There is no evidence that this specific conversation between the two defense lawyers actually occurred. Dr. Carter does state in his book that one of the purposes of the defense in cross-examining plaintiff was to discredit her testimony by introducing evidence that she was a common prostitute. *Scottsboro* at 206.

4. Plaintiff in this action contends that the movie falsely portrays her as defensive and evasive during her direct and cross-examination. Judge Horton found in his 1933 opinion granting a new trial that plaintiff was not a cooperative witness: "Her manner of testifying and her demeanor on the stand militate against her. Her testimony was contradictory, often evasive, and time and again she refused to answer pertinent questions."

5. Plaintiff claims that the last question put to her on cross-examination in the play is inaccurate. In the movie the defense attorney asks: "One more question: have you ever heard of a white woman being arrested for perjury when she was the complaining witness against Negroes in the entire history of the state of Alabama?" According to the 1933 trial transcript, the actual question was, "I want to ask you if you have ever heard of any single white woman ever being locked up in jail when she is the complaining witness against Negroes in the history of the state of Alabama?" Plaintiff objects to the insertion of the word "perjury" in the play.

6. In the play, Dr. Marvin Lynch, one of the doctors who examined plaintiff after she alighted from the train, approaches Judge Horton outside the courtroom and confides that he does not believe that the two women were raped by the Scottsboro boys. Dr. Lynch refuses to go on the witness stand and so testify, however. Plaintiff argues that this scene is improper because it is not supported in the 1933 trial record. This is true. Neither the 1933 trial transcript nor Judge Horton's opinion make reference to this incident. The Carter book does state, however, that Judge Horton told the author in a later interview that this incident occurred. *Scottsboro* at 214–15.

7. The play portrays events leading up to plaintiff's trip to Chattanooga with her friend, Ruby Bates. It was on the return trip to Alabama that the rape alleged occurred. Lester Carter, a defense witness in the play, testifies that he had intercourse with Ruby Bates on the night before the trip to Chattanooga and that plaintiff had intercourse with Jack Tiller. During the testimony there is a flashback that shows an exchange in a boxcar in which Ruby Bates suggests that they all go to Chatta-

---

**2.** Judge Horton's unreported opinion is printed as an appendix at the end of this opinion since it is the basis of many of the scenes in the play.

nooga and plaintiff says, "[m]aybe Ruby and me could hustle there while you two [Carter and Tiller] got some kind of fill-in work. What do you say?" This is an accurate abridgement of the substance of the actual testimony of Lester Carter at the 1933 trial, although Price denied, both at the 1933 trial and in the defamation trial below, that she had had intercourse with Tiller. Judge Horton specifically found that she did not tell the truth. The dramatization quoted or closely paraphrased substantial portions of Judge Horton's 1933 opinion. Judge Horton concluded that the testimony of Victoria Price "is not only uncorroborated, but is contradicted by other evidence," evidence that "greatly preponderates in favor of the defendant":

> When we consider, as the facts hereafter detailed will show, that this woman had slept side by side with a man the night before [the alleged rape] in Chattanooga, and had intercourse at Huntsville with Tiller on the night before she went to Chattanooga ... the conclusion becomes clearer and clearer that this woman was not forced into intercourse with all of these Negroes upon the train, but that her condition [the presence of dead sperm in her vagina] was clearly due to the intercourse that she had on the nights previous to this time.

8. Lester Carter also testifies in the play that plaintiff urged him to say that he had seen her raped. The 1933 trial transcript reveals that Carter actually testified that he overheard plaintiff tell another white youth that "if you don't testify according to what I testify I will see that you are took off the witness stand ...." Judge Horton in his opinion observed that there was evidence presented at the trial showing that Price encouraged others to support her version of what had happened.

9. Another witness in the play, Dallas Ramsey, testifies that he saw plaintiff and Ruby Bates in a "hobo jungle" near the train tracks in Chattanooga the night before the train trip back to Alabama. Ramsey testifies that plaintiff stated that she and her husband were looking for work and that "her old man" was uptown scrounging for food. The play dramatizes Ramsey's testimony while he is on the stand by a flashback to the scene at the "hobo jungle." The flashback gives the impression that plaintiff is perhaps inviting sexual advances from Ramsey, although the words used do not state this specifically. The substance of Ramsey's testimony, as portrayed in the play, is found in the 1933 trial transcript. The record provides no basis for the suggestive flashback.

The facts recited above illustrate that the play does cast plaintiff in an extremely derogatory light. She is portrayed as a perjurer, a woman of bad character, a woman who falsely accused the Scottsboro boys of rape knowing that the result would likely be the electric chair. The play is a gripping and effective portrayal of its point of view about her, the Scottsboro boys, and Judge Horton. As an effective dramatic production, the play has won many awards, including the George Foster Peabody Award for playwriting and awards from the Screenwriters' Guild and the American Bar Association.

## II. COMMON LAW CLAIMS AND DEFENSES

### A. Defamatory Nature of the Published Material

Taken as a whole, the play conveys a defamatory image of the plaintiff. Although the words "bum" and "hustle" may be considered rhetorical hyperbole and therefore not necessarily defamatory, *Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974), the reference to plaintiff as a "whore" and her portrayal as a perjurer and a suborner of perjury is obviously defamatory. The suggestive flashbacks showing her inviting sexual advances of Ramsey and Tiller reinforce the defamation. The effect of the drama as a whole is to create a character, Victoria Price. She is portrayed as a loose woman who falsely accuses the Scottsboro boys of raping her. This image of her character is created throughout the play by her own words and actions in the

flashbacks and in the witness chair and by what others say about her.

### B. The Privilege of Fair Comment

■ The portrayal of Victoria Price in this way is not expressed in the play as a matter of opinion. The characterization is expressed as concrete fact. The common law privilege of fair comment, adopted in Tennessee and explained in *Venn v. Tennessean Newspapers, Inc.*, 201 F.Supp. 47, 52 (M.D.Tenn.1962), *aff'd*, 313 F.2d 639 (6th Cir.), *cert. denied*, 374 U.S. 830, 82 S.Ct. 1872, 10 L.Ed.2d 1053 (1963), is now protected as opinion under the First Amendment, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). But this play does not say to the viewer that this is NBC's opinion about the character and actions of Victoria Price. It shows her inviting sexual intercourse and swearing falsely. We do not believe this characterization fits within the traditional fair comment privilege protecting opinion. *See Cianci v. New York Times Publishing Co.*, 639 F.2d 54 (2nd Cir. 1980, *as amended* Oct. 27, 1980) (magazine article interpreting evidence of rape not expression of opinion).

### C. The Defense of Truth and the Privilege of Fair Report of a Judicial Proceeding

In his opinion setting aside the verdict, Judge Horton found, in effect, that NBC's characterization of Victoria Price was true. The movie characterizes her as Judge Horton found the facts in his opinion. This does not mean, however, that the case should be withdrawn from the jury on the basis of the defense of truth or the privilege of fair report of a judicial proceeding.

■ Neither Judge Horton's findings nor the final convictions based on the testimony of Victoria Price and affirmed on appeal settle the question of truth. That still remains an open question. Technical doctrines of res judicata and collateral estoppel do not apply in this context. Neither Victoria Price nor NBC were parties in the 1930s

trials. In addition, citizens obviously have a right to attack the fairness of a trial. Judicial proceedings resolve disputes, but they do not establish the truth for all time. In libel cases the question of truth is normally one for the jury in a defamation action.

■ Many of the scenes actually quote or paraphrase the trial transcript, but the movie is not a completely accurate report of the trial. Witnesses who corroborate Victoria Price's version of the facts are omitted. The portions of the original trial that show her as a perjurer and a promiscuous woman are emphasized. The flashbacks consistently show plaintiff's conduct in a derogatory light. The flashbacks entirely accept the theory of the case presented by Judge Horton and the defense and reject the theory of the case presented by the state and the plaintiff. Under such circumstances the common law privilege permitting publication of defamatory material as a part of a fair and accurate report on judicial proceedings is not satisfied. The element of balance and neutrality is missing. *See Langford v. Vanderbilt University*, 44 Tenn.App. 694, 318 S.W.2d 568 (1958).

### III. THE FIRST AMENDMENT DEFENSES

### A. Plaintiff was a Public Figure During the Scottsboro Trials

Since common law defenses do not support the directed verdict for NBC, we must reach the constitutional issues, particularly the question whether plaintiff should be characterized as a "public figure." In *Gertz*, the Supreme Court held that one characterized as a "public figure," as distinguished from a private individual, "may recover for injury to reputation *only on clear and convincing proof* that the defamatory falsehood was made *with knowledge of its falsity or with reckless disregard for the truth.*" 418 U.S. at 342, 94 S.Ct. at 3008 (emphasis added).[3] In balancing the need to protect "private personality" and reputa-

---

3. In *Gertz*, a lawyer representing in civil litigation the family of an individual killed by a Chicago policeman was held not to be a public figure and the malice standard was therefore held inapplicable to the publisher of article accusing the lawyer of "framing" the policeman.

tion against the need "to assure to the freedoms of speech and press that 'breathing space' essential to their free exercise," the Supreme Court has developed a general test to determine public figure status.

■ *Gertz* establishes a two-step analysis to determine if an individual is a public figure. First, does a "public controversy" exist? Second, what is "the nature and extent of [the] individual's participation" in that public controversy? 418 U.S. at 352, 94 S.Ct. at 3013. Three factors determine the "nature and extent" of an individual's involvement: the extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication in order to counteract false statements, and the prominence of the role played in the public controversy. 418 U.S. at 344–45, 94 S.Ct. at 3009.

■ The Supreme Court has not clearly defined the elements of a "public controversy." It is evident that it is not simply any controversy of general or public interest. Not all judicial proceedings are public controversies. For example, "dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz*." *Time, Inc. v. Firestone*, 424 U.S. 448, 455, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). Several factors, however, lead to the conclusion that the Scottsboro case is the kind of public controversy referred to in *Gertz*. The Scottsboro trials were the focus of major public debate over the ability of our courts to render even-handed justice. It generated widespread press and attracted public attention for several years. It was also a contributing factor in changing public attitudes about the right of black citizens to equal treatment under law and in changing constitutional principles governing the right to counsel and the exclusion of blacks from the jury.

■ The first factor in determining the nature and extent of plaintiff's participation is the prominence of her role in the public controversy. She was the only alleged victim, and she was the major witness for the State in the prosecution of the nine black youths. Ruby Bates, the other young woman who earlier had testified against the defendants, later recanted her incriminating testimony. Plaintiff was left as the sole prosecutrix. Therefore, she played a prominent role in the public controversy.

■ The second part of the test of public figure status is also met. Plaintiff had "access to the channels of effective communication and hence ... a ... realistic opportunity to counteract false statements." *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009. The evidence indicates that plaintiff recognized her importance to the criminal trials and the interest of the public in her as a personality. The press clamored to interview her. She clearly had access to the media and was able to broadcast her view of the events.

The most troublesome issue is whether plaintiff "voluntarily" "thrust" herself to the forefront of this public controversy. It cannot be said that a rape victim "voluntarily" injects herself into a criminal prosecution for rape. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). In such an instance, voluntariness in the legal sense is closely bound to the issue of truth. If she was raped, her participation in the initial legal proceedings was involuntary for the purpose of determining her public figure status; if she falsely accused the defendants, her participation in this controversy was "voluntary." But legal standards in libel cases should not be drawn so that either the courts or the press must first determine the issue of truth before they can determine whether an individual should be treated as a public or a private figure. The principle of libel law should not be drawn in such a way that it forces the press, in an uncertain public controversy, to guess correctly about a woman's chastity.

■ When the issue of truth and the issue of voluntariness are the same, it is necessary to determine the public figure status of the individual without regard to whether she "voluntarily" thrust herself in the forefront of the public controversy. If

there were no evidence of voluntariness other than that turning on the issue of truth, we would not consider the fact of voluntariness. In such a case, the other factors—prominence and access to media—alone would determine public figure status. But in this case, there is evidence of voluntariness not bound up with the issue of truth. Plaintiff gave press interviews and aggressively promoted her version of the case outside of her actual courtroom testimony. In the context of a widely-reported, intense public controversy concerning the fairness of our criminal justice system, plaintiff was a public figure under *Gertz* because she played a major role, had effective access to the media and encouraged public interest in herself.

### B. Plaintiff Remains a Public Figure for Purposes of Later Discussion of the Scottsboro Case

The Supreme Court has explicitly reserved the question of "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 n.7, 99 S.Ct. 2701, 2707, n.7, 61 L.Ed.2d 450 (1979). In *Wolston* the District of Columbia Circuit found that plaintiff was a public figure and retained that status for the purpose of later discussion of the espionage case in which he was called as a witness. The Supreme Court found that the plaintiff's role in the original public controversy was so minor that he was not a public figure. It therefore reserved the question of whether a person retains his public figure status.

 Plaintiff argues that even if she was a public figure at the time of the 1930s trial, she lost her public figure status over the intervening forty years. We reject this argument and hold that once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of *that controversy*. This rule finds support in both case law and analysis of the constitutional malice standard.

On this issue the Fifth Circuit has reached the same conclusion as the District of Columbia Circuit in *Wolston*. In *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238 (5th Cir. 1980), plaintiff sued when a newspaper implied that she was reviving a long-dormant romantic relationship with Elvis Presley. The Fifth Circuit concluded that although the passage of time might narrow the range of topics protected by a malice standard, plaintiff remained a public figure when the defendant commented on her romantic relationship. The court noted that plaintiff's name continued to be connected with Presley even after her retirement from show business.

Other courts have assumed *sub silentio* that the public figure status was retained over the passage of time. *See, e. g., Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978) (having spent most of their early years in limelight, sons of Julius and Ethel Rosenberg are public figures for purposes of subsequent commentary on Rosenberg trials). Some courts have relied on a pre-*Gertz* "newsworthiness" analysis to support a finding that the passage of time did not alter the standard of liability. *See, e. g., Sidis v. F–R Publishing Corp.*, 113 F.2d 806, 809 (2d Cir.), *cert. denied*, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940) (affirms invasion of privacy judgment for magazine that updated a twenty-seven year old story on child prodigy despite fact that subject had become a recluse; "his subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern"); *Time, Inc. v. Johnston*, 448 F.2d 378, 381 (4th Cir. 1971) (former professional basketball player was still a public figure despite nine years of retirement; "event to which publication related remained a matter of public interest not simply because of its relation to plaintiff's own career; it had an equal or greater interest as marking the spectacular debut of [Bill] Russell in a career that was still phenomenal at the time of the publication").

Our analytical view of the matter is based on the fact that the Supreme Court developed the public figure doctrine in order that the press might have sufficient breathing room to compose the first rough draft of history. It is no less important to allow the historian the same leeway when he writes the second or the third draft.

Our nation depends on "robust debate" to determine the best answer to public controversies of this sort.[4] The public figure doctrine makes it possible for publishers to provide information on such issues to the debating public, undeterred by the threat of liability except in cases of actual malice.[5] Developed in the context of contemporaneous reporting, the doctrine promotes a forceful exchange of views.

 Considerations that underlie the public figure doctrine in the context of contemporaneous reporting also apply to later historical or dramatic treatment of the same events. Past public figures who now live in obscurity do not lose their access to channels of communication if they choose to comment on their role in the past public controversy. And although the publisher of history does not operate under journalistic deadlines it generally makes little difference in terms of accuracy and verifiability that the events on which a publisher is reporting occurred decades ago. Although information may come to light over the course of time, the distance of years does not necessarily make more data available to a reporter: memories fade; witnesses forget; sources disappear.

There is no reason for the debate to be any less vigorous when events that are the subject of current discussion occurred several years earlier. The mere passage of time does not automatically diminish the significance of events or the public's need for information. A nation that prizes its heritage need have no illusions about its past. It is no more fitting for the Court to constrain the analysis of past events than to stem the tide of current news. From Alfred Dreyfus to Alger Hiss, famous cases have been debated and reinterpreted by commentators and historians. A contrary rule would tend to restrain efforts to shed new light on historical events and reconsideration of past errors.

 The plaintiff was the pivotal character in the most famous rape case of the twentieth century. It became a political controversy as well as a legal dispute. As the white prosecutrix of nine black youths during an era of racial prejudice in the South, she aroused the attention of the nation. The prosecutions were among the first to focus the conscience of the nation on the question of the ability of our system of justice to provide fair trials to blacks in the South. The question persists today. As long as the question remains, the Scottsboro boys case will not be relegated to the dusty pages of the scholarly treatise. It will remain a living controversy.

### C. Evidence Insufficient to Support Malice [6]

 A plaintiff may not recover under the malice standard unless there is "clear and convincing proof" that the defamation was published "with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008. There is no evidence that NBC had

---

4. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1117 (6th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

5. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343–46, 94 S.Ct. 2997, 3008–3010, 41 L.Ed.2d 789 (1974).

6. The District Court found that even if plaintiff was a public figure forty years ago, she no longer was a public figure at the time of publi-

cation. The court then directed a verdict for NBC on grounds that there was no evidence of negligence. The evidence indicates, however, that there is arguably some proof of negligence by NBC. NBC was notified between the first and second showings of the film that not only was plaintiff alive but that she objected to her characterization in the movie. NBC made no attempt to verify the factual presentation in the movie thereafter. This arguably presents a jury-submissible case of negligence, as Judge Peck's dissent points out.

knowledge that its portrayal of Victoria Price was false or that NBC recklessly disregarded the truth. The derogatory portrayal of Price in the movie is based in all material respects on the detailed findings of Judge Horton at the trial and Dr. Carter in his book. When the truth is uncertain and seems undiscoverable through further investigation, reliance on these two sources is not unreasonable.

We gain perspective on this question when we put to ourselves another case. Dr. Carter, in his book, persuasively argues, based on the evidence, that the Communist Party financed and controlled the defense of the Scottsboro boys. A different playwright might choose to portray Judge Horton as some Southern newspapers portrayed him at the time—as an evil judge who associated himself with a Communist cause and gave his approval to interracial rape in order to curry favor with the eastern press. The problem would be similar had Judge Horton—for many years before his death an obscure private citizen—sued the publisher for libel.

 Some controversial historical events like the Scottsboro trials become symbolic and take on an overlay of political meaning. Speech about such events becomes in part political speech. The hypothetical case and the actual case before us illustrate that an individual's social philosophy and political leanings color his historical perspective. His political opinions cause him to draw different lessons from history and to see historical events and facts in a different light. He believes the historical evidence he wants to believe and casts aside other evidence to the contrary. So long as there is no evidence of bad faith or conscious or extreme disregard of the truth, the speaker in such a situation does not violate the malice standard. His version of history may be wrong, but the law does not punish him for being a bad historian.

The malice standard is flexible and encourages diverse political opinions and robust debate about social issues. It tolerates silly arguments and strange ways of yoking facts together in unusual patterns. But it

is not infinitely expandable. It does not abolish all the common law of libel even in the political context. It still protects us against the "big political lie," the conscious or reckless falsehood. We do not have that in this case.

Accordingly, the judgment of the District Court is affirmed.

## APPENDIX

MORGAN CIRCUIT COURT

STATE OF ALABAMA, Plaintiff )
vs. ) June 22, 1933
HAYWOOD PATTERSON, Defendant )

The defendant in this case has been tried and convicted for the crime of rape with the death penalty inflicted. He is one of nine charged with a similar crime at the same time.

The case is now submitted for hearing on a motion for a new trial. As human life is at stake, not only of this defendant, but of eight others, the Court does and should approach a consideration of this motion with a feeling of deep responsibility, and shall endeavor to give it that thought and study it deserves.

Social order is based on law, and its perpetuity on its fair and impartial administration. Deliberate injustice is more fatal to the one who imposes than to the one on whom it is imposed. The victim may die quickly and his suffering cease, but the teachings of Christianity and the uniform lessons of all history illustrate without exception that its perpetrators not only pay the penalty themselves, but their children through endless generations. To those who deserve punishment, who have outraged society, and its laws[,] on such an impartial justice inflicts the penalties for the violated laws of society, even to the taking of life itself; but to those who are guiltless the law withholds its heavy hand.

The Court will decide this motion upon the sole consideration of what is its duty under the law. The Court must be faithful in the exercise of the powers which it believes it possesses as it must be careful to abstain from the assumption of those not

within its proper sphere. It has endeavored with diligence to enlighten itself with the wisdom declared in the cases adjudged by the most pure and enlightened judges who have ornamented the Courts of its own state, as well as the distinguished jurists of this country and its Mother England. It has been unstinted in the study of the facts presented in the case at bar.

The law wisely recognizes the passions, prejudices and sympathies that such cases as these naturally arouse, but sternly requires of its Ministers freedom from such actuating impulses.

The Court will now proceed to consider this case on the law and evidence only making such observations and conclusions as may appear necessary to explain and illustrate the same.

There are a number of grounds of the motion. The Court has decided that no good purpose may be subserved in considering a number of these; without deciding whether these grounds are well based or not, the Court sees no need of their being considered. These omitted grounds are such as probably would not re-occur in another trial, and if they did they would certainly be under a different form. The vital ground of this motion, as the Court sees it, is whether or not the verdict of the jury is contrary to the evidence. Is there sufficient credible evidence upon which to base a verdict?

The first consideration is what is the law of Alabama on the question of setting aside verdicts of juries on this ground. The cases are numerous and only a few will be cited.

\* \* \* \* \* \*

The law as to granting new trials in cases of rape is thus summed up in 33 Cyc.P. 1497[:]

"But defendant should not be convicted without corroboration where the testimony of the prosecutrix bears on its face indications of unreliability or improbability, and particularly when it is contradicted by other evidence; and where the evidence preponderates in favor of defendant, or the verdict appears to have been influenced by passion or prejudice, it should always be set aside unless there is corroboration of prosecutrix."

With the law so written, let us now turn to the facts of the case. The Court will of necessity consider in detail the evidence of the chief prosecutrix, Victoria Price, to determine if her evidence is reliable, or whether it is corroborated or contradicted by the other evidence in the case. In order to convict this defendant, Victoria Price must have sworn truly to the fact of her being raped. No matter how unreliable the testimony of the defendant and his witnesses, unless the State can make out a case upon the whole evidence a conviction cannot stand.

The claim of the State is that this defendant raped Victoria Price; that is the charge. The circumstances under which the crime was claimed to have been committed appear as follows:

On March 25th, 1931, the prosecutrix, Victoria Price, and Ruby Bates, her companion, boarded a freight train at Chattanooga, Tennessee, for the purpose of going to Huntsville, Alabama. On the same train were seven white boys, and twelve negroes, who it appears participated, or are charged with participating in the occurrences on such train. All were tramps or "hoboing" their way upon this same freight train. About Stevenson, Alabama, a fight occurred between the negroes and the white boys and all the white boys, except one named Gilley, got off the train, or were thrown off the train, a short time after the train left Stevenson, Alabama. The distance from Stevenson to Paint Rock is thirty eight miles. The train was travelling between twenty five and thirty five miles an hour. Some of the white boys, who were thrown off the train returned to Stevenson, Alabama, and the operator there telegraphed to Paint Rock, a place down the line, reporting the fight, causing a posse and a large crowd to form at Paint Rock and took therefrom nine negroes, one of whom was this defendant, the two white girls, and their white companion, Gilley. The negroes were arrested and lodged in

the Scottsboro jail as well as the two women, and the seven white boys. The two women were forthwith carried to the office of a physician in Scottsboro, arriving there from one hour to one and one half hours after they claimed a rape was committed upon them, and were examined by two skilled physicians, Drs. Bridges and Lynch. It was while the train was travelling between Stevenson and Paint Rock, between shortly after noon and three o'clock that the alleged rape was committed.

There have been two trials of this case; one at Scottsboro and the other the recent trial at Decatur. The trial at Scottsboro was reversed by the Supreme Court of the United States, who declared the defendants did not have the assistance of counsel. The motion in this case is upon the result of the trial at Decatur. The evidence at the trial at Decatur was vastly more extensive and differed in many important respects from the evidence at Scottsboro.

Much of the evidence at Scottsboro was introduced at the trial at Decatur, and the Court will consider the entire evidence submitted as it may appear necessary in considering this motion. The Court shall endeavor in quoting the evidence to quote it substantially, and sometimes literally as given, only stating its substance when requisite to make its meaning clear.

As stated the State relies on the evidence of the prosecutrix, Victoria Price, as to the fact of the crime itself, necessarily claiming that her relation is true. The defense insists that her evidence is a fabrication—fabricated for the purpose of saving herself from prosecution for vagrancy, or some other charge.

The Court will, therefore, first set out the substantial facts testified to by Victoria Price and test it as the law requires, as to its reliability, or probability, and as to whether it is contradicted by the other evidence.

She states that on March 25, 1931, she was on a freight train travelling through Jackson County from Stevenson to Paint Rock; that Ruby Bates was with her on the train; that she had boarded the train at Chattanooga, Tennessee; that when she first boarded the train she got on an oil tank car. That at Stevenson, she and Ruby Bates walked down the train and got on a gondola car—a car without a top. That the car was filled with chert, lacking about one and one half or two feet of being full. That the chert was sharp, broken rock with jagged ends; that as the train proceeded from Stevenson seven white boys got in the car with them and that they all sat down in one end of the car, next to a box car; that in about five or ten minutes twelve colored boys jumped from the box car into the gondola, jumping over their heads. That the defendant was one of them. That the colored boys had seven knives and two pistols; that they engaged in a fight with the white boys ejecting all from the train except one, Orville Gilley; that this white boy stayed on the gondola, remained there and was still on the car when Paint Rock was reached, and saw the whole thing that thereafter occurred on this car. That one of the negroes picked her up by the legs and held her over the gondola, and said he was going to throw her off; that she was pulled back in the car and one of the negroes hit her on the side of the head with a pistol causing her head to bleed; that the negroes then pulled off the overalls she was wearing and tore her step-ins apart. That they then threw her down on the chert and with some of the negroes holding her legs and with a knife at her throat, six negroes raped her, one of whom was the defendant; that she lay there for almost an hour on the jagged rock, with the negroes lying on top of her, some of whom were pretty heavy; that the last one finished just five minutes before reaching Paint Rock and that her overalls had just been pulled on when the train stopped at Paint Rock with the posse surrounding it. That she got up and climbed over the side of the gondola and as she alighted she became unconscious for a while, and that she didn't remember anything until she came to herself in a grocery store and she was then taken to Scottsboro, as the evidence shows, in an automobile and that in about an hour or an hour and one

half Dr. Bridges and Dr. Lynch made an examination of her person.

This witness further testified that she was wet on her private parts; that each negro wetted her more and more; that her private parts were bleeding; that the blood was on her clothes; that her coat had semen on it; that when Dr. Bridges and Dr. Lynch examined her they saw her coat and it was all splattered over with semen; that her dresses had blood and semen on it; that she had them on when the doctors examined her; that the coat was cleaned and that she washed the dresses in the jail before the trial. The evidence further shows without dispute that all nine negroes were taken in charge by the officers and carried to the Scottsboro jail.

With seven boys present at the beginning of this trouble[,] with one seeing the entire affair, with some fifty or sixty persons meeting them at Paint Rock and taking the women, the white boy, Gilley, and the nine negroes in charge, with two physicians examining the women within one to one and one half hours, according to the tendency of all the evidence, after the occurrence of the alleged rape, and with the acts charged committed in broad day light, we should expect from all this cloud of witnesses or from the mute but telling physical condition of the women or their clothes some one fact in corroboration of this story. Let us consider the rich field from which such corroboration may be gleaned.

1. Seven boys on the gondola at the beginning of the fight, and Orville Gilley, the white boy, who remained on the train, and who saw the whole performance.

2. The wound inflicted on the side of Victoria Price's head by the butt end of a pistol from which the blood did flow.

3. The lacerated and bleeding back of the body, a part of which was stripped of clothing and lay on jagged sharp rock, which body two physicians carefully examined for injuries shortly after the occurrence.

4. Semen in the vagina and its drying and starchy appearance of the pubic hair and surrounding parts.

5. Two doctors who could testify that they saw her coat all splattered over with semen; who could testify to the blood and semen on her clothes, and to the bleeding vagina.

6. Two doctors who could testify to the wretched condition of the women, their wild eyes, dilated pupils, fast breathing and rapid pulse.

7. The semen which must have eventually appeared with increasing evidence on the pants of the rapists as each wallowed in its spreading ooze. The prosecutrix testified semen was being emitted by her rapists, and common sense tells us six discharges is a considerable quantity.

8. Live spermatozoa, the active principle of semen, would be expected in the vagina of the female from so recent discharges.

9. The washing before the first trial by Victoria Price of the very clothes which she claimed were stained with semen and blood.

The Court will now present the evidence which will show:

That none of the white seven boys, or Orville Gilley, who remained on the train were put on the stand, except Lester Carter; that neither Dr. Bridges nor Dr. Lynch saw the wound inflicted on the head by the pistol, the lacerated or bleeding back which lay on jagged rocks; that the semen they found in the vagina of Victoria Price was of small amount; that the spermatozoa were non-motile, or dead; that they saw no blood flowing from the vagina; that they did not testify as to seeing the semen all splattered over the coat or blood and semen on the clothes; any torn garments or clothes; that these doctors testified that when brought to the office that day neither woman was hysterical or nervous about it at all, and that their respiration and pulse were normal; and that the prosecutrix washed the clothes evidencing the blood and semen.

Taking up these points in order what does the record show: None of the seven white boys were put on the stand, except Lester Carter, and he contradicted her.

Next was Victoria Price hit in the head with a pistol? For this we must turn to Dr. Bridges. It was agreed in open court that Dr. Lynch, who in company with Dr. Bridges at Scottsboro examined the two girls would testify in all substantial particulars as Dr. Bridges, and Dr. Lynch was excused with that understanding when Dr. Bridges completed his examination. In considering Dr. Bridges' testimony we observe he was a witness placed on the stand by the State. His intelligence, his fair testimony, his honesty and his professional attainments, impressed the Court, and certainly all that heard him. He was frank and unevasive in his answers. The Court's opinion is that he should be given full faith and credit. In further considering his testimony it was shown that he was examining these women with the most particular care to find evidence of a rape upon them, and that the women were accusing the negroes, and were being required to co-operate and exhibit whatever indicated they had been abused. Returning to the pistol lick on the head. The doctor testifies: I did not sew up any wound on this girl's head; I did not see any blood on her scalp. I don't remember my attention being called to any blood or blow on the scalp. And this was the blow that the woman claimed helped force her into submission.

Next, was she thrown and abused, as she states she was, upon the chert—the sharp, jagged rock?

Dr. Bridges states as to physical hurts; we found some small scratches on the back part of the wrist; she had some blue places in the small of the back, low down, in the soft part, three or four bruises about like the joint of your thumb, small as a pecan, and then on the shoulders a blue place about the same size, and we put them on the table, and an examination showed no lacerations. The evidence of other witnesses as well as the prosecutrix will show that the women had travelled from Huntsville to Chattanooga, and were on the way back. There is other evidence tending to show they had spent the night in a hobo dive; that they were having intercourse with men shortly before that time. These few blue spots, and this scratch would be the natural consequence of such living; vastly greater physical signs would have been expected from the forcible intercourse of six men under such circumstances.

Victoria Price testified that as the negroes had repeated intercourse with her she became wetter and wetter around her private parts; and that they finished just as they entered Paint Rock, and that she was taken in an automobile immediately to the Doctor's office. There Dr. Bridges and Dr. Lynch, as has been shown, examined her. They looked for semen around her private parts; they found on the inside of her thighs some dirty places. These dirty places were hardly dry, and were infiltrated with dust about what one would get from riding trains. It was dark dirt or dust. While the doctor did not know what this drying fluid was, his opinion was that it was semen, but whatever it was, it was covered with heavy dust and dirt. He next examined the vagina to see whether or not any semen was in the vagina. In order to do this he takes a cotton mop and with the aid of a speculum and headlight inserts the cotton mop into the woman's vagina and swabs around the cervix, which is the mouth of the uterus or womb. He extracts from this vagina the substance adhering to the cotton after he has swabbed around the cervix, and places this substance under the microscope. He examines this substance to see if spermatozoa are to be found, and what is the condition of the spermatozoa. Upon the examination under the microscope he finds that there are spermatozoa in the vagina. This spermatozoa he ascertains to be non-motile. He says to the best of his judgment that non-motile means the spermatozoa were dead. For any fluid escaping from the vagina to become infiltrated with coal dust and dirt this dirt under the circumstances in this case must have gradually sifted upon the drying fluid, and necessarily a considerable period of time would be required for such an infiltration. The fresh semen emitted by so many negroes would have a tendency rather to wash off any dirty places around the vagina, and it must

have remained there for a considerable period for it to become thus infiltrated with dust and coal dust. Around the cervix the spermatozoa live under the most favorable conditions. While the life of the spermatozoa may be variable, still it appears from the evidence that in such a place as this it would have taken at least several hours for the spermatozoa to have become non-motile or dead. When we consider as the facts hereafter detailed will show that this woman had slept side by side with a man the night before in Chattanooga, and had intercourse at Huntsville with Tiller on the night before she went to Chattanooga. When we further take into consideration that the semen being emitted, if her testimony were true, was covering the area surrounding the private parts, the conclusion becomes clearer and clearer that this woman was not forced into intercourse with all of these negroes upon that train, but that her condition was clearly due to the intercourse that she had had on the nights previous to this time.

Was there any evidence of semen on the clothes of any of the negroes? In the case of *State v. Cowing*, 99 Minn. 123; ... [108 NW 851], the Court said the physicians who testified stated that the semen would have remained on the clothes and could have been found after the expiration of several days. And this is probably a well known fact. Though these negroes were arrested just after the alleged acts, and though their clothes and pants were examined over by the officers, not a witness testified as to seeing any semen or even any wet or damp spots on their clothes.

What of the coat of the woman splattered with semen, and the blood and semen on the clothes and the bleeding vagina?

Dr. Bridges says he did not see any blood coming from her vagina; that Mrs. Price had on step-ins, but did not state that they were torn or had blood or semen on them. Not a word from this doctor of the blood and semen on the dress; not a word of the semen splattered over the coat. And this was a doctor so conscientious and thorough in his examination as to make the woman undress and to examine with care every part of her body; a doctor who in his search for semen went to the extent of swabbing out the vagina and of examining its contents under the microscope.

What of the physical appearance of these two women when the doctors saw them? Dr. Bridges says that when these two women were brought to his office neither were hysterical, or nervous about it at all. He noticed nothing unusual about their respiration and their pulse was normal.

Such a normal physical condition is not the natural accompaniment, or result of so horrible an experience, especially when the woman testified she fainted from the injuries she had received.

The fact that the women were unchaste might tend to mitigate the marked effect upon their sensibilities but such hardness would also lessen the probability of either of them fainting. If the faint was feigned then her credibility must suffer from such feigned actions. And this witness' anger and protest when the doctors insisted on an examination of her person was not compatible with the depression of spirit likely to be caused by the treatment she said she had received.

Lastly, before leaving Dr. Bridges let us quote his summation of all that he observed:

"Q. In other words the best you can say about the whole case is that both of these women showed they had had intercourse?

"A. Yes, sir."

Is there corroboration in this? We think not, especially as the evidence points strongly to Victoria Price having intercourse with one Tiller on several occasions, just before leaving Huntsville. That she slept in a hobo jungle in Chattanooga, side by side with a man. The dead spermatozoa, and the dry dirty spots would be expected from those earlier acts.

Victoria Price testified that she washed her clothes which were stained with semen and blood before even the trial at Scottsboro.

The Supreme Court of Minnesota in the case of *State v. Cowing*, 99 Minn. 123 . . . [108 N.W. 851], in setting aside a conviction of rape laid great stress and largely based its actions upon such conduct of the prosecuting witness; this Court said:

"While not without some corroboration, the testimony of prosecutrix is aided most largely by that of her sister; but, that corroboration is to be weighed in connection with the fact, that she and her sister, by washing the skirt, which if her testimony were true, would probably have borne evidence of blood and semen, effectually destroyed the best possible evidence under the circumstances."

Is there any other corroboration? There was a large crowd at Paint Rock when the freight arrived there. While they differed in many details as to the make up of the train and the exact car from which the different persons were taken, all of which is apparently important, all agreed upon the main fact, that the nine negroes, the two women, and the white boy were all taken from the train. This disputed fact constitutes about the whole extent of their evidence, except a statement by Ruby Bates that she had been raped which experience the said Ruby Bates now repudiates. This statement by Ruby Bates appears to have been made under the following circumstances: There were three witnesses who testified to having seen the women at Paint Rock. One of the witnesses first saw them after they had gotten off the car and were both standing. Another witness did not see them for some time, he having first rounded up all the negroes. The third witness saw them as they were getting off the car. He states they first started to run toward the engine and as they approached a crowd of men they turned and ran back in the opposite direction, and met a part of the posse who stopped them. Mr. Hill the Station Agent then came up to the women and asked them if the negroes had bothered them. Thereupon Ruby Bates stated that they had been raped. The facts appearing that the women instead of seeking the protection of the white men they saw were at first frightened, and the question propounded was in itself suggestive of an answer. Mr. Hill also states that the negroes were in a coal car and they were trying to climb over the sides, were pulling themselves up, trying to get off. This clearly indicates that the negroes were not in the car filled with chert as the prosecutrix claims.

For any other corroboration in the evidence we now return to the freight train as it passes along the track just after leaving Stevenson. The witness, Lee Adams, at a point about one quarter of a mile from the train sees a fight between a number of white and colored boys; this is an admitted fact in the case.

The evidence of Ory Dobbins was admitted in corroboration of Victoria Price. When his evidence is studied it is found it does not corroborate her, or if so slightly. The good faith of this witness need not be the slightest questioned, only the lack of correspondence of his testimony with hers. He stated that he lives three miles from Stevenson near the railroad as it ran toward Scottsboro; that as he walked to his barn he saw a freight train; that as it passed his house he saw a white woman sitting on the side of a gondola and a negro put his arm around her waist and throw her back in the car; that he saw the car as it passed; that it was in his line of vision for a few feet, pointing out a door in the court room as the distance. His reason for stating it was a woman is as follows:

"Q. You know it was woman don't you?
A. She had on woman's clothes.
COURT: She had on women's clothes?
Q. What kind of clothes, overalls?
A. No, sir, dress."

The very basis of his statement that she was a woman because she had on a dress does not apply to the women in this case, who were dressed in overalls.

He said it was in a coal car and there were five or six people in the car. Victoria Price says when they took hold of her that it occurred in a car almost filled with chert, and there were fifteen people in the car. The witness Dobbins said the gondola was between two box cars, while the evidence

shows the gondola in which the woman was was the fifth of a string of eight gondolas.

The witness further stated that the car upon which he saw this occurrence was back toward the caboose. On the other hand the official make up of the train shows the freight train consisted of forty cars; that the women were in the eleventh or twelfth car from the engine and there were twenty eight or twenty nine cars between this car and the caboose. In view of the fact that it was along this vicinity that the fight occurred between the negroes and the white boys, and as his reason for saying it was a woman was on account of the dress, and all agree these women had on overalls, this can at its best be only slight corroboration.

This is the State's evidence. It corroborates Victoria Price slightly, if at all, and her evidence is so contradictory to the evidence of the doctors who examined her that it has been impossible for the Court to reconcile their evidence with hers.

Next was the evidence of Victoria Price reasonable or probable? Were the facts stated reasonable? This is one of the tests the law applies.

Rape is a crime usually committed in secrecy. A secluded place or a place where one ordinarily would not be observed is the natural selection for the scene of such a crime. The time and place and state of this alleged act are such to make one wonder and question did such an act occur under such circumstances. The day is a sunshiny day the latter part of March; the time of day is shortly after the noon hour. The place is upon a gondola or car without a top. This gondola according to the evidence of Mr. Turner, the conductor was filled to within six inches to twelve or fourteen inches of the top with chert, and according to Victoria Price up to one and one half feet or two feet of the top. The whole performance necessarily being in plain view of any one observing the train as it passed. Open gondolas on each side. On top of this chert twelve negroes rape two white women; they undress them while they are standing on this chert; this prosecuting witness is then thrown down and with one negro continuously kneeling over her with a knife at her throat, and one or more holding her legs, six negroes successively have intercourse with her on top of that chert, as one arises off of her person, another lies down upon her; those not engaged are standing or sitting around; this continues without intermission although that freight train travels for some forty miles through the heart of Jackson County; through Fackler, Hollywood, Scottsboro, Larkinsville, Lin Rock and Woodville, slowing up at several of these places until it is halted at Paint Rock; Gilley a white boy, pulled back on the train by the negroes, and sitting off according to Victoria Price in one end of the gondola, a witness to the whole scene; yet he stays on the train, and he does not attempt to get off of the car at any of the places where it slows up to call for help; he does not go back to the caboose to report to the conductor or to the engineer in the engine, although no compulsion is being exercised upon him, and instead of there being any threat of danger to him from the negroes, they themselves have pulled him back on the train to prevent him being injured from jumping off the train after it had increased its speed; and in the end by a fortuitous circumstance just before the train pulled into Paint Rock, the rapists cease and just in the nick of time the overalls are drawn up and fastened, and the women appear clothed as the posse sight them. The natural inclination of the mind is to doubt and to see further search.

Her manner of testifying and demeanor on the stand militate against her. Her testimony was contradictory, often evasive, and time and again she refused to answer pertinent questions. The gravity of the offense and the importance of her testimony demanded candor and sincerity. In addition to this the proof tends strongly to show that she knowingly testified falsely in many material aspects of the case. All this requires the more careful scrutiny of her evidence.

The Court has heretofore devoted itself particularly to the State's evidence; this

evidence fails to corroborate Victoria Price in those physical facts, the condition of the woman raped, necessarily speaking more powerfully than any witness can speak who did not view the performance itself. The Court will next consider her credibility, and in doing so, some of the evidence offered for the defendant will also come in for consideration. In considering any evidence for the defendant which would tend to show that Victoria Price swore falsely the Court will exclude the evidence of witnesses for defendant, who themselves appear unworthy of credit, unless the facts and circumstances so strongly corroborate that evidence that it appears true.

Lester Carter was a witness for the defendant; he was one of the white boys ejected from the train below Stevenson. Whether or not he is entitled to entire credit is certainly a question of great doubt; but where the facts and circumstances corroborate him, and where the failure of the State to disprove his testimony with witnesses on hand to disprove it, the Court sees no reason to capriciously reject all he said.

Victoria Price denied she knew him until she arrived at Scottsboro; it became a question to be considered as to whether Lester Carter knew her at Huntsville and saw her committing adultery on several occasions with one Tiller just before leaving for Chattanooga, and returning on the freight the next day; the facts he testified to might easily account for the dead spermatozoa in her vagina. He says he met Victoria Price and Tiller while in jail at Huntsville. That all three were inmates of the jail at the same time. That Ruby Bates visited Tiller and Victoria Price while they were in jail, and he, Carter[,] met her at the jail. That after all had gotten out, and he had finished his sentence, he stayed in the home of Tiller and his wife, and he and Tiller would go out and be with these girls. They all planned the Chattanooga trip together, and that just before the trip, or the night before all four were engaged in adulterous intercourse. Victoria Price stated on the stand that Tiller, the married man, was her boyfriend and was in her home the night before she left for Chattanooga; that he had

a right there, and he was corresponding with her. Tiller was in the State's witness room then and identified by Lester Carter, when he was brought out of the witness room by the Court's order. Tiller though there in court was not put on the stand to deny what Carter said. There is no reason to doubt Carter was telling the truth then. Next Carter said that when he and Ruby Bates and Victoria Price arrived in Chattanooga about eight o'clock at night, all went to what is known as the "Hoboes Jungle", a place where tramps of all descriptions spent the night in the open; there are numerous witnesses who corroborate him in this statement; that they met the boy Gilley and all four slept side by side, he by the side of Ruby Bates, and Victoria by the side of Gilley. Victoria Price said that she and Ruby Bates went to Chattanooga seeking work; that they went alone and spent the night at Mrs. Callie Brochie's, a friend of hers formerly living in Huntsville, but had moved to Chattanooga. Was this true? The Chattanooga Directory was introduced in evidence; residents of Chattanooga, both white and colored, took the stand stating that no such woman as Callie Brochie lived in Chattanooga and had not ever lived there so far as they knew. Though Victoria Price first made this statement more than two years ago at Scottsboro, no witness was offered either from Chattanooga or Huntsville showing any such woman had ever lived in either such place.

Victoria Price said the negroes jumped off a box car over their heads into the gondola, where she, Ruby Bates, and the seven white boys were riding with seven knives and two pistols and engaged in a fight with the white boys; the conductor of the train who had the official make-up of the train stated there were eight gondola cars together on the train; that the women were in one of the middle cars, and that there were three gondola cars between the car in which they were riding and the nearest box car. Lester Carter stated that he was one of the seven boys engaged in the fight with the negroes; that he did not see a single knife or pistol in the hands of the

negroes. And although these seven white boys were kept in jail at Scottsboro until after the first trial no one testified to any knife or pistol wounds on any of them.

Further there was evidence of trouble between Victoria Price and the white boys in the jail at Scottsboro because one or more of them refused to go on the witness stand and testify as she did concerning the rape; that Victoria Price indicated that by so doing they would all get off lighter.

The defendant and five of the other negroes charged with participating in this crime at the same time went on the stand and denied any participation in the rape; denied they knew anything about it, and denied that they saw any white women on the train. Four of them did state that they took part in the fight with the white boys, which occurred on the train. Two of them testified that they knew nothing of the fight, nor of the girls, and were on an entirely different part of the train. Each of these two testified as to physical infirmities. One testified he was so diseased he could hardly walk, and he was examined at Scottsboro according to the evidence and was found to be diseased. The other testified that one eye was entirely out and that he could only see sufficiently out of the other to walk unattended. The physical condition of this prisoner indicates apparently great defect of vision. He testified, and the testimony so shows that he was in the same condition at Scottsboro and at the time of the rape. He further testified that he was on an oil tank near the rear of the train, about the seventh car from the rear; that he stayed on this oil tank all of the time and that he was taken off of this oil tank. The evidence of one of the trainmen tends to show that one of the negroes was taken off of an oil tank toward the rear of the train. This near blind negro was among those whom Victoria Price testified was in the fight and in the party which raped her and Ruby Bates. The facts strongly contradict any such statement.

History, sacred and profane, and the common experience of mankind teach us that women of the character shown in this case are prone for selfish reasons to make false accusations both of rape and of insult upon the slightest provocation, or even without provocation for ulterior purposes. These women are shown, by the great weight of evidence, on this very day before leaving Chattanooga to have falsely accused two negroes of insulting them, and of almost precipitating a fight between one of the white boys they were in company with and these two negroes. This tendency on the part of the women show that they are predisposed to make false accusations upon any occasion whereby their selfish ends may be gained.

The Court will not pursue the evidence any further.

As heretofore stated the law declares that a defendant should not be convicted without corroboration where the testimony of the prosecutrix bears on its face indications of unreliability or improbability, and particularly when it is contradicted by other evidence. The testimony of the prosecutrix in this case is not only uncorroborated, but it also bears on its face indications of improbability and is contradicted by other evidence, and in addition thereto the evidence greatly preponderates in favor of the defendant. It, therefore, becomes the duty of the Court under the law to grant the motion made in this case.

It is, therefore, ordered and adjudged by the Court that the motion be granted; that the verdict of the jury in this cause, and the judgment of the Court sentencing this defendant is hereby vacated and set aside and a new trial is ordered.

James E. Horton
Judge of Morgan Circuit Court

JOHN W. PECK, Senior Circuit Judge, dissenting.

The majority offers no convincing reasons in law or policy for extending to NBC the protection of the *New York Times* privilege of freedom from liability for defamatory statements made without "malice." Forty years after the events that made Mrs. Street famous (or infamous), the purposes behind the *legal* distinction (not the every-

day distinction) between public figures and private individuals are served only by ranking Mrs. Street among the latter.

The majority exalts "robust debate on social issues." So do we all. If that were the only interest of weight in defamation and privacy cases, there would be no need to distinguish between public figures and private persons in our law. It would be much better to apply the *New York Times* "malice" test in all cases; yet it is no mystery why this is not our rule of law.

The Constitution does not protect damaging misstatements of fact because of their intrinsic worth. "[T]here is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). False reports are protected because they are "inevitable in free debate." *Id.* The inevitability of *demonstrable* error lessens with the passage of time. Accordingly, when the pressures of contemporaneous reporting subside, the need for the protection of the "malice" standard disappears. A negligence[1] standard is enough. I would follow the reasoning of Justices Blackmun and Marshall, and hold that the passage of time can extinguish public figure status. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 169–72, 99 S.Ct. 2701, 2708–10, 61 L.Ed.2d 450 (1979) (concurring opinion).

The majority adopts the rule, not that public figure status is eternal, but that it

persists as long as the public controversy that gave rise to it. For my brethren, Scottsboro persists as a public controversy because the trials have taken on "an overlay of political meaning." In short, Mrs. Street is a public figure today because the majority thinks the Scottsboro affair merits public attention. This reasoning resurrects the "newsworthiness" test for applying the "malice" standard in defamation cases—a test proposed by a plurality of the Supreme Court in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971), and rejected by a majority of the Court in *Gertz.* It is not the business of judges to decide "what information is relevant to self-government." *Gertz, supra*, 418 U.S. at 346, 94 S.Ct. at 3010 (quoting Justice Marshall's dissent in *Rosenbloom*).

*Gertz* put an end to the binary system where defamatory publications either enjoyed the protection of the "malice" standard or suffered the strict liability imposed by the common law. The majority ignores the distinctions drawn in *Gertz* and casts the issues of this case in terms of speech versus suppression of speech. This perception also overlooks the basic distinction in tort law between compensation and punishment. Although under *Gertz* and current Tennessee law Mrs. Street could recover actual damages upon showing falsity,[2] negligence, causation and injury, she could not receive punitive damages without proving

1. Under *Gertz*, states may, in actions brought by private persons, set their own standards of liability for defamation, "so long as they do not impose liability without fault...." 418 U.S. at 347, 94 S.Ct. at 3010. Tennessee applies a negligence standard. *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn.1978).

2. In *Nichols, supra* note 1, the Tennessee Supreme Court stated that there is a presumption of the falsity of an alleged defamatory utterance—a presumption which "the defendant may rebut by proving truth as a defense." 569 S.W.2d at 420. This correctly states the common law, but such a presumption cannot be reconciled with *Gertz's* command that states not impose liability without fault. *See Herbert v. Lando*, 441 U.S. 153, 159, 170, 175–76, 99 S.Ct. 1635, 1639, 1646, 1648–49, 60 L.Ed.2d 115 (1979); *Cianci v. New Times Pub. Co.*, 639 F.2d 54 at 60 (2d Cir. 1980, *as amended* Oct. 27, 1980) (per Friendly, J.). *Cianci* speaks only of

cases within the ambit of *Sullivan*. I would go farther and hold that *Gertz* requires plaintiffs to prove falsity in all defamation cases. The majority adopts neither approach, but rather treats truth as a defense, although noting that public figure plaintiffs must show "malice" by clear and convincing evidence.

Under Tennessee law, *substantial* truth or falsity is at issue in defamation cases. *Nichols, supra*, 569 S.W.2d at 420–21. *Nichols* held that a literally true article could convey a defamatory meaning by the omission of essential, unobvious facts. I believe the logical extension of this is that a trivially inaccurate report could convey a substantially true meaning. This of all theories would best support the directed verdicts in this case, although I nonetheless believe the question of truth was improperly taken from the jury.

"malice." *See, e. g., Gertz* at 418 U.S. 349, 94 S.Ct. at 3011; *Maheu v. Hughes Tool Co.,* 569 F.2d 459 (9th Cir. 1977); *Davis v. Schuchat,* 510 F.2d 731 (D.C.Cir.1975). Thus Mrs. Street's status as a public or private person determines only what she must prove to show a prima facie entitlement to compensatory damages. It does not determine whether the law may "punish" historians for error, or prohibit them from committing error.

By making a plaintiff's status hinge on its determination of the significance of a defendant's speech, the majority pushes the Court into a quagmire where the law of defamation is standardless, easily manipulated, and no more speech-protective than the judges who happen to be applying it. The better approach is to take the distinction between public and private figures back to its roots, and examine the present status of the plaintiff in light of the reasons behind the distinction, as did Justices Blackmun and Marshall in *Wolston.* See 443 U.S. at 170–72, 99 S.Ct. at 2709–2710 (concurring opinion).

The First Amendment affords less protection to the reputations of public figures not because news of them is deemed significant but because they can more easily rebut falsehoods in public media, and because they have as a rule assumed the risk of public commentary. In short, the law encourages and expects those labeled public figures to be uninhibited, robust debaters. *See Wolston, supra,* 443 U.S. at 164, 99 S.Ct. at 2706; *Gertz, supra,* 418 U.S. at 344, 94 S.Ct. at 3009. This is too much to expect of the plaintiff today.

Over forty years ago, the prominence Mrs. Street gained through the Scottsboro trials allowed her to speak through public media. She was unquestionably a public figure in the current legal sense. Today her voice cannot rebut network "docudramas," which literally reach the entire nation in "gripping" displays. Few people assume the risk that the most personal aspects of their lives will be presented to the nation as dramatic entertainments. The majority hold that Mrs. Street assumed that risk by her involvement in an unspecified number of interviews over forty years ago.

When NBC broadcast "Judge Horton," Mrs. Street was not only not a public figure, she was a nonentity. Dr. Carter, historian and author of the book on which "Judge Horton" was loosely based, had been unable to trace Mrs. Street, and had described her death in some detail.[3] The majority offers no convincing reason why those who would write of her today should not be liable for damages caused by their failure to make reasonable efforts to get their facts straight.

*Gertz* and its progeny compel the conclusion that public figure status is determined by looking at a plaintiff's media power or public involvement at the time of the alleged defamation. I know of no case holding a person as presently obscure as Mrs. Street a public figure. Of the cases offered by the majority in support of its contrary position, the only one that is remotely similar to the present case[4] and that has not

**3.** Wrote Bancroft Award winner Carter: "Like the Scottsboro boys, Victoria Price and Ruby Bates were also soon forgotten.

. . . .

. . . In 1961, thirty miles apart from each other, Ruby Bates and Victoria Price died." D. Carter, Scottsboro: A Tragedy of the American South 415–16 (1969) (footnote omitted).
Even Homer nods.

**4.** In *Brewer v. Memphis Pub. Co., Inc.,* 626 F.2d 1238 (5th Cir. 1980), the plaintiffs were former entertainers—a television personality and a football player—whose public figure status was "not tied to a particular public controversy," *id.* at 1257, as the majority finds Mrs. Street's to be. More important, the defamatory article in

*Brewer* purported to describe the contemporary actions of the plaintiffs—not events that occurred forty years before publication. Thus, "the article was not an historical reflection but a newspaper article that purported to relate a contemporaneous event." *Id.* (footnote omitted).

The venerable case of *Sidis v. F–R Pub. Corp.,* 113 F.2d 806 (2d Cir.), *cert. denied,* 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940), must be distinguished on precisely the same ground.

The plaintiff in *Time, Inc. v. Johnston,* 448 F.2d 378 (4th Cir. 1971), did, as the majority notes, "retire" nine years before publication of the alleged defamation, but he retired only as a

been superseded [5] or reversed [6] is *Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). The majority opinion notes *Meeropol* as one of the cases that assumes "*sub silentio*" that public figure status endures with the controversy giving rise to it. After considering the public figure question, the Court in *Meeropol* added:

> [E]ven if we assumed *arguendo* that Robert and Michael Meeropol were not "public figures" at the time this book was published, the book could not have defamed them or invaded their privacy since the book never referred to them by the Meeropol name or in any way linked the Rosenbergs to the Meeropols.

560 F.2d at 1068. Thus, whatever the *Meeropol* Court said about public figure status was irrelevant to its holding. Since the Court did not provide the reasoning behind its earlier assumption that the Meeropols were public figures, *see* 560 F.2d 1066, this dictum carries no persuasive force.

## II

NBC broadcast "Judge Horton" not once but twice. Nothing in the record shows that the network was even negligent in the first broadcast: the best available information from the leading scholar on the Scottsboro incident was that Victoria Price Street was dead.

After the first broadcast, Mrs. Street brought a defamation action against NBC and sought an injunction against republication of the program. The district court wisely refused to issue such an injunction. Mrs. Street's complaint vaguely alleged that NBC's program presented a false, sensationalized picture of her, but gave no examples of false statements in the program. Nothing in the record allows the inference that agents of NBC's did in fact seriously doubt the truth of any specific factual presentation in "Judge Horton." I therefore fully agree with the majority's conclusion that no jury question of "malice" existed under the subjective *New York Times* standard.

Yet under the objective, "ordinarily prudent person" standard that the courts of Tennessee apply in defamation actions brought by private persons,[7] a jury could readily conclude that NBC was negligent in its second broadcast of "Judge Horton." NBC's counsel admitted at trial that no one at NBC compared the transcripts of the 1933 Patterson trial with the parts of the movie purporting to reenact that trial. Dr. Carter and the screenwriter of "Judge Horton" testified that no one at NBC discussed

---

player. Johnston remained in organized professional basketball until two years before publication. At the time of the publication "he was a college basketball coach, still involved as a public figure in basketball." *Id.* at 381.

**5.** As the majority opinion notes, both *Sidis* and *Johnston, supra* note 4, antedate *Gertz*.

**6.** *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d 427 (D.C.Cir.1978), *rev'd*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). The D. C. Circuit held that Wolston was a public figure in 1958, and rejected in one paragraph the argument that this status had passed with time. *Id.* at 431. The Supreme Court, reversing, held that Wolston was never a public figure, and did not decide whether or when an individual may cease to be a public figure. 443 U.S. at 166 n. 7, 99 S.Ct. at 2707 n. 7. However, the Supreme Court rejected the Circuit Court's notion that Wolston remained a public figure because Soviet espionage remained a "legitimate topic of debate." The Court found this delineation of the pertinent public controversy so broad as to leave nothing to debate. *See* 443 U.S. at 166 n. 8, 99 S.Ct. at 2707 n. 8. *See also* note 9, *infra*.

**7.** *See Nichols, supra*, 569 S.W.2d at 418. A 1955 Tennessee statute sets lack of "due care" as the standard of broadcasters' liability for defamatory statements uttered on the air by those other than the broadcasters' agents. Tenn.Code Ann. § 29–24–104(a) (Michie 1980). Under this statute, broadcasters carry the burden of showing that due care was taken. *Id.* § 29–24–104(b).

The statute's uniform standard of liability has been superseded by *Gertz's* dual standards. The statute's allocation of the burden of proof is now unconstitutional. *See New York Times v. Sullivan*, 376 U.S. 254, 283–84, 84 S.Ct. 710, 727–728, 11 L.Ed.2d 686 (1964). The majority opinion is silent on the applicability and constitutionality of this statute.

NBC's counsel admitted at oral argument that he had discovered this statute, unilaterally found it inapplicable, and decided not to bring it to the trial court's attention.

Mrs. Street's charges of falsity with them. NBC might have chosen to rely on the conclusions in Dr. Carter's historical work, but a jury would be permitted to determine whether this reliance was unreasonable in light of Dr. Carter's testimony that parts of "Judge Horton" find no support whatsoever in Dr. Carter's history.

My fundamental disagreement with the majority concerns the constitutionality of permitting states to impose liability for negligence in defamation cases where the pressures of contemporaneous reporting are totally absent. The majority argues that different pressures work on historians, since "the distance of years does not necessarily make more data available to a reporter: memories fade; witnesses forget; sources disappear." Obviously, a negligence standard does not expect a writer to discover what is forever lost. When truth is unknowable, falsity, and hence defamation,[8] cannot be proven.

### III

The majority's unstated assumption is that application of the *New York Times* "malice" standard necessarily creates "breathing space" for uninhibited speech.

> Yet a publisher's decision to print or broadcast a libelous story is only partly influenced by the probability of winning or losing a lawsuit. While the publication decision involves a complex calculus, the salient cost factors are likely to be the probability that the publisher will be sued, and the cost of defending if suit is brought. Rules affecting the publisher's ultimate liability are thus likely to be marginal considerations in the decision to publish.

L. Tribe, *American Constitutional Law* § 12–13 at 643 (1978). Since no evidentiary privilege protects the editorial process, *Herbert v. Lando*, 441 U.S. 153, 159–67, 99 S.Ct. 1635, 1639–44, 60 L.Ed.2d 115 (1979), litigation costs are not likely to vary with the application of *New York Times* "malice" or *Gertz* "fault" rules. In the present case, the district court did not decide the question of Mrs. Street's status until the close of all proof. Had this action been brought after *Lando*, and had the trial judge (contrary to his actual ruling) early in the trial held Mrs. Street a public figure, the evidence (and outcome) in the trial might have been different, but it is incredible that either the hypothetical or the actual outcomes would significantly influence future publishing decisions. Invocation of *New York Times v. Sullivan* does not exorcise what to the majority is the demon of self-censorship. Only abolition of the torts of defamation and invasion of privacy can do that, and that abolition is a price measured in individual dignity that our Constitution does not exact.

A living person is not a means to an end. Events may be symbolic, but individuals are not mere symbols.[9] The dramatic effect of "Judge Horton," and the merit of its historical interpretation, however important they may be to the majority, are not matters before us, nor were they before any jury. The substantial truth of factual assertions in the work, and the liability of the network for any material errors in them, were questions for the jury to decide.

---

8. *See* note 2, *supra.*

9. The Supreme Court has repeatedly refused to find individuals public figures because they were involved in events of symbolic or exemplary import. *See Wolston, supra,* 443 U.S. at 166–68, 99 S.Ct. at 2707–2708 (failure to comply with subpoena of grand jury investigating Soviet espionage in United States did not result in public figure status); *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976) (society divorce is not a "public

controversy" triggering application of malice standard in defamation action).

*Firestone* is vulnerable to the same criticisms as is *Rosenbloom's* "newsworthiness" test for first amendment privileges. *See* L. Tribe, *supra,* § 12–13 at 644. Yet one clear lesson of *Wolston* and *Firestone* is that the term "public controversy" is read narrowly, not broadly. With imagination, any human activity acquires "symbolic" importance.